[S. F. No. 12273. In Bank.—September 27, 1928.]

FRED S. NEWSOM et al., Petitioners, v. BOARD OF SUPERVISORS OF CONTRA COSTA COUNTY et al., Respondents.

Pierce & Carlson and Wilbur S. Pierce for Petitioners.

Archibald B. Tinning, District Attorney, for Respondents.

J. E. Rodgers, A. F. Bray, Pillsbury, Madison & Sutro, Dudley D. Sales, Jesse G. Benson, McCutchen, Olney, Mannon & Greene, Warren Olney, Jr., James M. Hanley, Eells & Orrick and Chickering & Gregory, as *Amici Curiae*.

SHENK, J.—This is a second application to this court for a writ of mandate to compel the Board of Supervisors of Contra Costa County to submit to the electors of said county, pursuant to the initiative provisions of the constitution and section 4058 of the Political Code, a proposed ordinance, the purpose of which is to grant to the Northern California Development Company, a corporation, a franchise to construct and maintain a toll-bridge across the Straits of Carquinez, which forms the boundary between the county of Contra Costa and the county of Solano. On the first application the writ was denied. (*Galvin* v. *Board of Supervisors,* 195 Cal. 686 [235 Pac. 450].) In the determination of that matter the doctrine was announced that an ordinance proposed by the electors of a county under the initiative law must constitute such legislation only as the Board of Supervisors has power to enact under the constitution and laws of the state granting, defining, and limiting the powers of that body. (See, also, *Myers* v. *Stringham,* 195 Cal. 672 [235 Pac. 448].) It was held in the Galvin case that the Board of Supervisors was without the power to enact the ordinance presented to it for adoption for the reason that the notices of the application for the franchise had not been given as required by section 2870 of the Political Code, that a hearing on the application had not been had as required by section 2871 of the Political Code and that the state engineer had not been notified of the desire of the Board of Supervisors to grant such a franchise as required by section 4 of the act of March 14, 1881 (Stats. 1881, p. 76).

After the decision on the first application and commencing on June 18, 1926, the petitioner, Northern California Devel-

opment Company, published notices of its application for leave to erect a toll-bridge in purported compliance with the statute. Thereafter, on July 19, 1926, there was presented to the county clerk of Contra Costa County a petition to submit to a vote of the electors of said county an ordinance granting to the Northern California Development Company a franchise to construct and maintain a toll-bridge over the Straits of Carquinez. A copy of the proposed ordinance was attached to the petition designating therein the location of the proposed bridge, fixing the amount of the statutory penal bond, fixing the amount of the license tax to be paid by the person or corporation taking tolls on said bridge, fixing the rate of tolls for crossing said bridge, fixing the terms of the franchise, requiring the bridge to be constructed within a certain time and to be of a certain width, character, description, and material, and providing for the purchase of said bridge by the counties of Contra Costa and Solano and for the acquisition of said bridge by the state of California upon the expiration of said franchise. This initiative petition also notified the Board of Supervisors that the signers thereof had by separate petition requested the state engineer to designate to said board the draw (if any) to be made in the proposed bridge and also the length of the span thereof necessary to permit the free flow of water. The initiative petition was checked by the county clerk as to the number of signatures thereon and was found by him to be sufficient in that respect.

The petition to the state engineer referred to in the initiative petition was addressed to the state engineer and was signed by the same number of electors who had signed the initiative petition addressed to the Board of Supervisors. Pursuant to the petition to him, the state engineer, under date of July 20, 1926, addressed to the Board of Supervisors a communication designating the matters and things requested by said petition to be designated by him. In said communication the state engineer did not, however, designate the width of the draw to be made in the bridge as required by section 4 of the act of March 14, 1881 (Stats. 1881, p. 76), nor did he decide or declare therein that no draw was necessary. It appears from the petition herein that the petition to the state engineer was presented to that

official after the Board of Supervisors had refused to make the request.

The initiative petition, together with the proposed ordinance, was presented to the respondent Board of Supervisors at the regular meeting of the board on August 2, 1926. Hearing on the application for the franchise was set for August 9, 1926, at 10 o'clock A. M., at which time protests were filed with said board against the granting of the franchise. At the hearing oral and documentary evidence was produced before and received by said board both for and against the application. At the conclusion of the hearing the board made an order denying the application and denying the request and demand of the Northern California Development Company that the communication from the state engineer hereinbefore referred to be spread upon the minutes of the board. Whereupon demand was made upon the Board of Supervisors that it pass the proposed ordinance without alteration within ten days after August 2, 1926, or proceed forthwith to call a special election at which said ordinance should be submitted to a vote of the electors of Contra Costa County. The demand was refused by formal order of the board and thereafter, on October 19, 1926, this petition for a writ of mandate was filed.

In response to the petition the respondents filed an answer admitting certain allegations of the petition, denying others, and alleging certain matters of affirmative defense. The position of the respondents is that there is no duty resting upon them to enact said ordinance pursuant to the demand of the petitioner corporation to enact the same and no duty resting upon them to submit said proposed ordinance to a vote of the electors of the county of Contra Costa. It is insisted that the proposed ordinance, if enacted, would be in contravention of general laws of the state in numerous particulars set out in the answer and in the briefs. Numerous briefs have been filed by *amici curiae* stressing the same points from different angles and additional points to the effect that no duty rests upon the Board of Supervisors to submit said ordinance to a vote of the electors of said county. It would serve no useful purpose and would unduly prolong this opinion to discuss them all. One of the contentions of the respondents and certain of *amici curiae* would seem to require first attention. That contention is that the consti-

tutional and statutory provisions relating to the initiative are inapplicable to the process of granting a toll-bridge franchise under existing law, because of the discretionary power vested in the Board of Supervisors and the fact-finding preliminary steps necessary to the lawful granting of such a franchise.

■ It should first be observed that the right to take tolls which the petitioner corporation seeks to acquire is a franchise and as such is a privilege of public concern, the exercise whereof is subject to such public regulation, control, and administration as may be prescribed by the state itself or by its subordinate governmental agencies thereunto duly authorized. ''The theory upon which such rights are granted is to promote the public good and convenience, the advancement of commerce, and the more ready intercourse of the people. . . .'' (*Fortain* v. *Smith*, 114 Cal. 494 [46 Pac. 381].) The legislature of this state assumed control of the granting of toll-bridge franchises and the regulation of operations thereunder as early as 1854, when ''An Act Concerning Public Ferries and Toll Bridges'' was adopted. (Stats. 1854, p. 123.) It is worthy of note that in the amendment of section 22 of article XII of the constitution in 1911 and of section 23 of the same article in 1911 and 1914, and in the statutes since enacted relating to public utilities, the laws of the state relating to the granting and regulations of toll-bridge franchises has remained unchanged thereby. In other words, toll-bridge regulations have been from the early history of the state and now are in a class by themselves. Through the years they have remained subject to legislative control. In the act of 1854 the court of sessions was granted authority to establish toll-bridges whenever deemed necessary except across navigable waters. It was provided therein that the permission to operate a toll-bridge should be in the discretion of the court and that no license should be issued unless it should first be made to appear that such toll-bridge was necessary for the accommodation of the public. An elaborate procedure was provided governing the granting of the application for the right to take the tolls, including publication of notice of the application, the manner of construction, and the materials to be used, the fixing of the tolls and the duties of the toll-bridge keeper. These regulations have continued in the same or a modified or amplified form by subsequent legislation. The

act of April 28, 1855 (Stats. 1855, p. 183), transferred the discretionary power to grant toll-bridge franchises and to regulate the operations thereunder, subject to statutory regulations, to the Boards of Supervisors of the several counties, and that discretion has remained in such boards under subsequent legislation to the present time. The law now governing the application and granting of toll-bridge franchises and the public regulation of the grantee's rights thereunder, is found in the act of March 14, 1881, and enactments incorporated mainly in the Political Code. Section 2870 of that code provides that every applicant for authority to construct a toll-bridge must publish notices of the time when the application will be made to the Board of Supervisors for such authority. Section 2871 provides that on the hearing of the application any person may appear and be heard. At such hearing the Board of Supervisors may take testimony, or authorize it to be taken by any judicial officer of the county, and the hearing may be continued from time to time. Section 2872 provides that if the board be of the opinion that the public interest will be promoted thereby, it may, by the assent of a majority of its members, grant the application by an order entered in its minutes, particularly designating the bridge. By section 2873 the board is granted power to require that the bridge be constructed within a certain time, be of a certain width, character, or description, and be constructed of certain materials. Section 2875 provides that all bridges constructed over navigable streams must have a draw or swing of sufficient space or span to permit the safe, convenient, and expeditious passage at all times of any water craft which may navigate the water bridged. Section 2876 vests in the board the power to regulate the number of animals that may be driven over the bridge at any one time and to provide rules for the government of the draws or swings and attendance of the same. Section 2878 provides that when the bridge is completed and a certificate that it is completed and is safe and convenient for public use is signed by the commissioner of highways or president of the Board of Supervisors and filed in the office of the county clerk, the owner may erect a toll-gate and require the payment of such tolls as the Board of Supervisors has fixed and may from time to time prescribe. Section 2843 provides that when authority to construct a toll-

bridge over waters dividing two counties is desired, application must be made to the Board of Supervisors of that county situated on the left bank descending. Section 2845 provides that the Board of Supervisors in granting such authority must at the same time (1) fix the amount of the penal bond to be given by the operator of the bridge and provide for the annual renewal thereof; (2) fix the amount of the license tax to be paid by such operator; (3) fix the rate of tolls collected for crossing the bridge which may raise annually an income not exceeding fifteen per cent on the actual cost of construction of the bridge and such additional income as will provide for the annual cost of operation, maintenance, amortization of, and taxes on the bridge; (4) fix the term for the operation of such bridge, which shall not exceed fifty years, and (5) make all necessary orders relative to the construction, erection, and business of licensed toll-bridges which they have by law the power to make. Section 2846 provides that the license tax and rate of toll fixed as provided in the preceding section must not be increased or diminished during the term of twenty years, unless it is shown to the satisfaction of the Board of Supervisors that the receipts from tolls in any one year are disproportionate to the cost of construction, or the fair cash value thereof, together with the cost of all necessary repairs and maintenance of the bridge and that the license tax fixed by the board must not exceed ten per cent of the tolls annually collected. Section 2847 provides that every owner or keeper of a toll-bridge must report annually to the board of supervisors the several items of costs, expenses, and revenue specifically set forth in the section. The obvious purpose of this report is to provide additional information not available to the board in fixing the license tax and tolls in the original franchise and to enable the Board of Supervisors to act intelligently and lawfully with reference to the amount of the license tax and tolls to be thereafter fixed. Section 2848 provides that whenever the Board of Supervisors is about to fix the license tax and rate of tolls, inquiry must be made of the items which are in the section made necessary for consideration and may for that purpose examine under oath the owner or keeper of the bridge and other witnesses, and that if the valuations as fixed by the board are not agreed to by the owner or keeper of the bridge, the same shall be

fixed by three commissioners, one to be appointed by the board, one by the owner, and the third by the county judge, who must hear testimony and fix such value and cost according to the facts and report the same to the Board of Supervisors under oath. Section 2849 provides that when the amounts are ascertained as prescribed by the preceding section, the Board of Supervisors must fix the rates of tolls and license tax and the amount of the penal bond. Section 2851 provides that when, as in the present case, the bridge connects two counties the license tax must be paid to the two counties in equal proportions. Section 2854 provides that the owner of land on either side of the waters to be crossed, and the owner of the land on the left bank descending over the owner of the land on the right bank, is entitled to preference in procuring authority to construct the bridge, but if such owner fails or neglects to apply for such authority within a reasonable time after the necessity therefor arises, the Board of Supervisors may grant such authority to another.

Section 4 of the act of March 14, 1881, provides that whenever the Board of Supervisors of any county desires to grant the privilege of erecting and maintaining a toll-bridge to any individual or corporation across a navigable stream, said board "shall notify the state engineer of such purpose, and of the precise point where such bridge is proposed to be located. The state engineer shall, within ten days of the receipt of such notice, designate the width of the draw to be made in such bridge, and also the length of the span necessary to permit the free flow of water."

When the foregoing general law of the state is borne in mind, it is at once observed how inappropriate and impossible of operation would be the application of the initiative to the granting of a toll-bridge franchise thereunder. It has been recognized from an early date in the history of the state that in the exercise of their functions under particular statutes "the board of supervisors is a special tribunal, with mixed powers—administrative, legislative and judicial," and that in the discharge of its duties under the toll-bridge statute of 1855 (Stats. 1855, p. 183), which is the predecessor in the main of the present statutory law on this subject, the board exercised such mixed powers. (*Waugh* v. *Chauncey*, 13 Cal. 11.) Likewise, under present law the Board of

Supervisors in the consideration of an application for and in the granting of a toll-bridge franchise is called upon to exercise such mixed powers. It is required by the statute that a time be set for a public hearing on the application for the franchise. Protests against the granting thereof may be filed. Priorities may be asserted. The board is authorized to take testimony at such hearing or provide for the taking of testimony before any judicial officer of the county. The board is authorized to grant the franchise if it be "of the opinion that the public interests will be promoted thereby." (Sec. 2872, Pol. Code.) In arriving at this conclusion or the opposite conclusion the board is vested with broad discretionary power in the exercise of which the rights of the applicant, the rights of the protestants, if any, and the public interests must be taken into consideration. From the denial of the application in this case it is obvious that the board, after the hearing, concluded that the protests should be sustained, or that the public interest did not demand the granting of a franchise in such proximity to a recently constructed toll-bridge by another applicant and grantee of a franchise. Both reasons may have actuated the board in denying the application involved in this proceeding. The general laws of the state and the Political Code provisions above referred to vest in the Board of Supervisors broad discretionary powers. In the event it decides that the franchise should be granted, the board is required to fix the rate of tolls which may be collected for crossing the bridge. In fixing these tolls the board is required to take into consideration the cost of construction, operation, and maintenance of the bridge and permit an annual income from the tolls so fixed sufficient to raise not exceeding fifteen per cent on the actual cost of construction and such additional income as will provide for the annual cost of operation, maintenance, amortization of, and taxes on the bridge. The facts upon which to base proper toll charges, which in the proposed ordinance involved herein constitute not less than thirty-three different classifications of tolls, must be found by the Board of Supervisors in order that the grantee of the franchise receive just returns on the investment and thus satisfy the constitutional requirement that private property be not taken for public use without just compensation. These considerations requiring necessary and precedent findings of

fact by the board, together with the further statutory requirement of a hearing and a determination on protests and asserted prior rights, compel the conclusion that it was not intended, either by the provision of the constitution or by section 4058 of the Political Code, that the initiative should be applicable to the granting of a toll-bridge franchise under present law. In what has been said we have in mind the declarations of this court that the act of granting a franchise is legislative in character. (*People* v. *Board of Supervisors,* 122 Cal. 421 [55 Pac. 131], and cases therein cited; 12 Cal. Jur. 682.) It is concluded, however, that, under the law as it now stands, the legislative functions of the Board of Supervisors in considering and acting upon an application for a toll-bridge franchise are so intermingled with the administrative and *quasi*-judicial functions of said board as to render the operation of such law entirely inconsistent and unworkable with the initiative law. When the proposed initiative measure is presented to the board it must, under the law, be adopted without alteration and there is no discretion vested in the board to make its provisions with reference to license tax and tolls conform to the facts required to be found as a condition precedent to the granting of a valid franchise.

A determination that direct legislation was not intended to apply to all actions of subordinate governmental bodies involving in part the exercise of the legislative function is not new in this state. It has been said generally that "by the enactment of initiative and referendum laws the people have simply withdrawn from the legislative body and reserved to themselves the right to exercise a part of their inherent legislative power." (*Dwyer* v. *City Council,* 200 Cal. 505, 513 [253 Pac. 932, 935].) The passage of ordinances relating to the improvement of streets under certain street laws has been held not to be subject to control by the initiative because of discretionary power vested in the city council. (*Hyde* v. *Wilde,* 51 Cal. App. 82 [196 Pac. 118].) In *Chase* v. *Kalber,* 28 Cal. App. 561 [153 Pac. 397], it was held that, notwithstanding the fact that the action of a city council in adopting a resolution of intention to improve streets is legislative in character, none of the precedent steps necessary to be taken for the improvement of streets was intended to come within either the power of the initiative

or of the referendum and that the operation of direct legislation and the system provided by the legislature for the improvement of streets cannot coexist as to such matters. To the same effect is *Starbuck* v. *City of Fullerton,* 34 Cal. App. 683 [168 Pac. 583]. So, here, if the initiative be applicable to the granting of a toll-bridge franchise, the provisions of the state law vesting administrative and discretionary powers in the Board of Supervisors are to that extent repealed, a result which should not be declared except by a clear and unmistakable intention to that effect on the part of the legislative branch.

As affecting the limitations on the power of the legislature to establish a uniform system of county government under sections 4 and 5 of article XI of the constitution, it was said in *Galvin* v. *Board of Supervisors, supra,* at page 693 of 195 Cal. [235 Pac. 452] : "This grant of power to the legislature to enact general and uniform laws relating to the matters referred to in the foregoing clauses of the Constitution constitutes in itself a limitation upon the power of counties, whether acting through their regularly constituted legislative bodies or attempting to act directly through initiative legislation, to adopt ordinances or regulations which would have the effect of destroying the uniformity in regard to such matters which the state legislature by the enactment of general and uniform laws was required to create and maintain." After quoting extensively from the Political Code sections hereinabove referred to and from other general laws of the state, it was further said in that case at page 696 [235 Pac. 454] : "The foregoing provisions of the Political Code and of the general laws above quoted define and limit the powers of the board of supervisors of the county of Contra Costa in the matter of enacting legislation granting franchises for the erection and maintenance of toll bridges across the navigable waters which form the boundary line between said county and the county of Solano, and provide expressly and exclusively for the procedure which must precede such grant." The court was there discussing in the main the requirement of the law that the proposed ordinance, even if adopted under the initiative, must be accompanied by the same statutory precedent steps as to notices of the hearing on the application for the franchise and the request by the Board of Supervisors to the state engineer as were required in the case of

the granting of the franchise by act of the Board of Supervisors itself. It was not decided in that case that the initiative law would not apply to the granting of a toll-bridge franchise. It was rather assumed that if the proposed ordinance were adopted under the initiative it would yet be invalid for noncompliance with the general toll-bridge franchise law. The statement in that case, however, to the effect that such general law provides "expressly and exclusively for the procedure which must precede such grant," was prophetic of the present determination that such procedure must be followed in the granting of a toll-bridge franchise to the exclusion of the general law relating to the initiative.

Other points are made by the respondents. It is insisted that although the proposed initiative ordinance provides in section 9 thereof that the rate of tolls fixed therein shall remain unchanged for a period of twenty years unless the receipts from tolls in any one year be shown to be disproportionate to the cost of construction of the bridge or the fair cash value thereof together with the cost of all necessary repairs and maintenance of the bridge, there is no similar provision for a change in the license tax fixed by section 7 of the proposed ordinance within said period of twenty years as provided in section 2846 of the Political Code. It is also insisted that there is no provision in law for the substitution of the petition of twenty per cent of the electors of the county to the state engineer for his report in lieu of such a request by the Board of Supervisors, as required by section 4 of the act of March 14, 1881. The Galvin case is relied upon in this contention to the effect that the procedure laid down by the toll-bridge franchise law must be followed and no substitutions are legally permissible. It is also contended by certain *amici curiae* that the building of a toll-bridge across waters forming the boundary line between two counties is a matter of general state concern, or at least is of more than the concern of the one county on the left bank of the waterway descending, and that, therefore, the electors of but one of the counties should not be given the power to decide the question of granting the franchise. This is but another reason advanced indicating that the initiative as applied to the electors of one county should not be made to apply to the granting of such a franchise in which the two counties are interested. It is deemed unnecessary to discuss these

and other contentions of the parties and *amici curiae,* however meritorious they may appear to be, for the reason that our decision on the main point is decisive of the controversy.

From what has been said it is not to be inferred that the final act of the Board of Supervisors in granting a toll-bridge franchise might not be held to be subject to the referendum. When all of the required precedent steps of a discretionary and fact-finding nature have been taken by the board and the franchise has been regularly granted, a proper construction of the constitution and statutory law relating to the referendum might lead to the conclusion that the referendum would apply. That question is not involved in this proceeding and we express no opinion thereon.

The peremptory writ is denied.

Richards, J., Preston, J., Curtis, J., Langdon, J., and Waste, C. J., concurred.

SEAWELL, J., Concurring Specially.—I concur in the reasoning and conclusion of the main opinion, which, in substance, is to the effect that the general law of the state prescribing the procedure for the granting of licenses to erect and maintain toll-bridges across navigable waters of the state is inappropriate and practically impossible of operation in its application to the initiative method of enacting ordinances as the system is prescribed by section 4058 of the Political Code. In so doing I do not recede from the views expressed at length in the opinion filed in this cause November 22, 1927, (261 Pac. 990. Rehearing granted December 22, 1927).

My investigation of the subject upon the previous hearing of the cause inclined me to the view expressed in the main opinion as to the inapplicability of the initiative method of adopting an ordinance such as described herein. However, I then thought, and still think, that the conclusion herein arrived at can be as well, if not better, placed upon the ground that under the provisions of sections 528 to 530, inclusive, of the Civil Code, as those sections read at the time said initiative ordinance was presented to the Board of Supervisors for adoption, the authority to construct and operate the toll-bridge could be granted only to such corporations as were formed for the exclusive purposes of constructing and maintaining a particular designated toll-bridge.

The corporation in the instant case is not such a corporation, but was formed to conduct a large variety of enterprises and businesses, but nowhere in its articles of incorporation declared its intention to construct a toll-bridge across Carquinez Straits. There seems to be no loophole by which the statutory requirements as they formerly existed may be evaded. All of the statutes by which the right to a grant of franchise to construct a toll-bridge is authorized and all statutes germane thereto, whether of regulatory or administrative character, as specifically pointed out in the opinion rendered in the cause formerly before us, require that the corporation so applying must be formed for the specific purpose of constructing and maintaining said toll-bridge at a designated place. The many duties imposed upon said corporation and the penalties and forfeitures prescribed for a failure or neglect to conform with the many requirements of the statute, including strict accountability to the Board of Supervisors as to the amount of its capital stock, the amount paid in and annually expended, the amount received for tolls, the amount of dividends, and numerous other matters specified by statute respecting the business of the corporation, make it clear that the legislature did not intend to permit revenue derived from the operation of toll-bridges in which the public had an interest to become intermixed or confused with private funds derived from private enterprises.

Reading the several statutes together, and keeping in mind the fact that the legislature was more concerned with the public interest which it was endeavoring to conserve than it was in broadening the scope of private corporations organized for profit, there seems to be no substantial ground upon which petitioners may rest their demand.

The fact that private corporations have habitually omitted or refused to conform to the provisions of the statutes as written cannot have the force of repealing statutes.