[L. A. No. 21678. In Bank. Sept. 29, 1950.]

J. E. SIMPSON, Petitioner, v. BENJAMIN S. HITE, as Registrar of Voters, etc., Respondent; LOS ANGELES COUNTY COURTHOUSE COMMITTEE et al., Real Parties in Interest.

126

Loeb & Loeb, Herman F. Selvin and Dana Latham for Petitioner.

Harold W. Kennedy, County Counsel, A. Curtis Smith, Assistant County Counsel, and Clarence H. Langstaff, Deputy County Counsel, for Respondent.

Morrow & Trippet, Fred M. Cross, Oscar A. Trippet, F. B. Yoakum, Jr., Bailie, Turner & Lake, Robert Baker, Bodkin, Breslin & Luddy, Henry I. Dockweiler, Louis T. Fletcher, Freston & Files, Haas & Home, Elmer H. Howlett, Clifford E. Hughes, F. A. Knight, Kenyon F. Lee, L. H. Phillips, John W. Preston, Stanton, Stanton & Wellborne, Irving Walker, Westover & Smith, Mabel Walker Willebrandt, Emmet H. Wilson, Jr., J. Marion Wright and E. R. Young for Real Parties in Interest.

SCHAUER, J.—Petitioner asks that this court by mandate direct respondent, registrar of voters of Los Angeles County,

to omit a proposed initiative ordinance from the ballot to be used at the general election to be held November 7, 1950. The principal provisions of the proposed ordinance, in substance and effect, are (1) the repeal of resolutions of the Los Angeles County Board of Supervisors which designate, and pursuant to which the county has acquired, a site for municipal and superior courts buildings; (2) a declaration of the will of the people that such site be used for parking or some other useful purpose; and (3) a designation of another site for a building or buildings to house the courts. It appears also that as a necessary incident of the foregoing provisions, the ordinance would require the withdrawal by the county from, or abandonment of, contracts heretofore made for, or as preliminary to, the construction of the courts buildings on the already acquired site.

Respondent has joined issue by demurrer to the petition, and the proponents[1] of the proposed initiative ordinance have filed a demurrer and answer. Upon the facts pleaded, as admitted by the demurrers and by the answer, we have concluded that the proposed ordinance deals with administrative matters which, under state law, are committed solely to the board of supervisors; therefore, the ordinance is not within the initiative function and the peremptory writ should issue.

By state law[2] boards of supervisors are required to provide "suitable quarters" for superior and municipal courts. Such state law leaves to the boards of supervisors to determine, in

---

[1]The proponents of the initiative ordinance allege that they constitute the "Los Angeles County Courthouse Committee [and that it] is an unincorporated association of twenty-three civic leaders, business men and lawyers of the County of Los Angeles, . . . the majority of whom are citizens . . . and registered voters of said county; said Committee was organized in 1949 for the purpose of obtaining for the County of Los Angeles a single courthouse site . . . for the future construction thereon of a single building or adjacent and connecting buildings, to house the Superior and Municipal Courts and the County Law Library, in lieu of three separate, scattered sites theretofore selected by the Board of Supervisors, for the construction thereon of three separate buildings for said functions." The committee admits the prior acquisition by the county of the site selected by the board of supervisors and "admits that all of the site selected by the proposed Ordinance is privately owned except for a strip from Broadway to Hill Street with a frontage of about fifty-six (56) feet immediately north of the law library property," which "law library property," it is also admitted, "the Board of Law Library Trustees of the County of Los Angeles has held title to" since July 20, 1950, and which was acquired "for the purpose of constructing thereon a separate building for . . . [a] County law library" at a cost (for the land) of "about $580,333."

[2]See *post*, p. 131.

each case, what is required to constitute "suitable quarters." It is undisputed that suitable quarters for such courts are wanting and are needed in Los Angeles County, and that the board of supervisors has so determined. Some three years prior to the filing of the proposed initiative ordinance, the board of supervisors decided upon an area north of Temple Street, bounded on the east by North Broadway, as a site for a municipal courts building and a superior courts building. On June 26, 1947, the Los Angeles city planning commission duly approved the site proposed by the supervisors for the municipal courts building and on August 26, 1948, the commission duly approved the site for the superior courts building.[3] Between October 14, 1947, and July 6, 1948, the board of supervisors adopted a series of resolutions designating and directing acquisition of the area north of Temple Street as a site for the courts buildings. Pursuant to these resolutions, and in performance of the duty enjoined by the state law, the property was acquired at a cost of $1,550,085.61. The board appropriated and allocated funds aggregating $10,699,700 for construction of the buildings on the acquired site; of such funds it has spent $54,517.62 budgeted under the Accumulative Capital Outlay Act (Stats. 1937, ch. 717; Stats. 1949, ch. 14) "for the purpose of constructing" the superior courts building, and $484,883.98 appropriated from general funds "for purposes directly connected with the construction of said courts building." It employed architects who prepared plans for the buildings; it has paid the architects $170,654.40 for their services in respect to the municipal courts building and $507,305.34 for their services in respect to the superior courts building; further fees which it has agreed to pay the architects are payable as construction of the buildings progresses. (The possible liability of the county for further fees or damages in the event that the partially completed project is abandoned is as yet undetermined.) After public hearing the city planning commission duly approved the extent of such buildings and their situation on the area selected as a site. The board of supervisors called for bids for construction of the superior courts building and entered into a contract with the board of the Retirement Association[4] of the county of Los

---

[3]See discussion of the California Planning and Conservation Act (Deering's Gen. Laws, Act 5211c), *post,* p. 70. The city of Los Angeles has a comprehensive zoning plan (Ordinance 90500) and the county of Los Angeles has a master plan (Ordinance 1494).

[4]The county retirement association, which consists of all county employes (Gov. Code, § 31552), is managed by a retirement board of five

Angeles whereby the latter agreed to erect the municipal courts building and to lease it to the county. (The amount of liability, if any, on this contract in the event of withdrawal or abandonment by the county is another undetermined matter.)

At this stage in the carrying out of the project, on August 25, 1950, the initiative petition now in question was filed with the respondent. The area designated by the proposed initiative ordinance as a substitute site for the location of any new courthouse or courts building is south of Temple Street, bounded on the east by North Broadway, immediately across Temple Street from a portion of the site designated and acquired by the board of supervisors.

It is observed that the act of the board of supervisors in determining that "suitable quarters" for the superior and municipal courts were wanting and were needed, and that the provision of such quarters entailed the procurement of a suitable site and the construction of adequate buildings, does not appear to have been challenged by referendum or otherwise, and is not attacked by the proposed initiative ordinance. It is only the designation of the site which has already been acquired, and, perforce incidentally, the making of the architectural and construction contracts which are extant, that are attacked. Under the circumstances of this case, are these matters within the reach of the initiative?

The powers of initiative and referendum in Los Angeles County apply only to acts which are legislative in character, and not to executive or administrative acts. (See *Housing Authority* v. *Superior Court* (1950), 35 Cal.2d 550, 557 [219 P.2d 457]; *Essick* v. *City of Los Angeles* (1950), 34 Cal.2d 614, 624, 625 [213 P.2d 492]; note, 122 A.L.R. 769.)

The state Legislature has declared the legislative policy applicable here: that the board of supervisors shall provide suitable quarters for the municipal and superior courts.

---

members (Gov. Code, § 31520). The lease agreement between the Los Angeles retirement board and the county of Los Angeles was entered into under a state law which permits investment of funds of a retirement association in "[r]eal property or improvements . . . acquired for sale or lease to the county in which the retirement system is established" (Gov. Code, § 31595, par. (e)). Such an investment requires unanimous approval by the retirement board and approval of four-fifths of the board of supervisors. (Gov. Code, § 31601.) It also requires that the property and the plans of the proposed building be examined by an appraiser appointed by the retirement board and board of supervisors; the appraiser must determine whether the investment will return the statutorily permitted rate of interest. (Gov. Code, § 31603.)

(2 Deering's Gen. Laws, Act 5238, § 22, Stats. 1947, ch. 1101, § 1 ["The board of supervisors shall provide suitable quarters for the municipal courts"] ; Code Civ. Proc., § 144 ["If suitable rooms for holding the superior courts . . . are not provided in any county by the supervisors thereof, . . . the courts . . . may direct the sheriff of the county to provide such rooms"] ; *Ex parte Widber* (1891), 91 Cal. 367, 369 [27 P. 733] ["It will be conceded upon all sides that it is the duty of the board of supervisors to prepare suitable rooms . . . for the use of the judges of the superior courts"] ; Gov. Code, § 25351, Stats. 1947, ch. 424, § 1 ["The board may construct, lease, build . . . or repair buildings for a . . . courthouse . . . and such other public buildings as are necessary to carry out the work of the county government"].)

█ It seems obvious beyond the reach of serious argument that the board of supervisors cannot perform the duty of providing "suitable quarters" for the courts without selecting and designating the sites of the buildings to house the courts, as well as the character and size of the buildings. The determination of what is "suitable" as quarters for the courts necessarily includes the selection of a site as well as ascertainment of the extent and character of accommodations which a building or buildings must contain. Prescribing the policy and duty was the legislative act of the state; carrying out the policy by performing the duty is an administrative function delegated by the state to the local governing body, the board of supervisors. "The governing body of the [local political subdivision] . . . by its resolution did not make a law but thereby acted in an executive or administrative capacity as an instrumentality of the state to make operative the provisions of a state law already existing." (*State* v. *Butler* (1945), 145 Neb. 638 [17 N.W.2d 683, 690] ; see also *Kleiber* v. *City and County of San Francisco* (1941), 18 Cal.2d 718, 725 [117 P.2d 657] ; *Housing Authority* v. *Superior Court* (1950), *supra*, 35 Cal.2d 550, 558; *State* v. *Salome* (1949), 167 Kan. 766 [208 P.2d 198, 208] ; *Seaton* v. *Lackey* (1944), 298 Ky. 188 [182 S.W.2d 336, 339] ; *Dickson* v. *Hardy* (1932), (La.App.) 144 So. 519, 526.)

█ Here the state has acted to establish the basic policy and has vested the responsibility for carrying out that policy in a board of supervisors. The steps which the board has taken to carry out the state policy—the determination that for "suitable quarters" it was necessary or expedient to erect new buildings rather than to continue to use existing

buildings, the fixing of sites for the buildings to make them convenient for the purpose to be served, the determination of the size of the buildings, the arrangement of space therein to provide courtrooms, jury rooms, judges' chambers and all the other details which enter into implementing the legislative act of the state—viewed as parts of the entire project, are all inextricably interwoven and related. We are satisfied that, regardless of what might be the character of a particular step in another context, such steps appear here, in the respects in which they are sought to be interrupted and repealed or controlled by the initiative ordinance, to be predominantly and controllingly administrative in character.

The proponents of the initiative measure rely upon the following cases as establishing that the selection of the sites of the courts buildings is a legislative matter: *Hopping* v. *Council of City of Richmond* (1915), 170 Cal. 605 [150 P. 977]; *Hopping* v. *Council of City of Richmond* (1915), 170 Cal. 618 [150 P. 982]; *Hill* v. *Board of Supervisors* (1917), 176 Cal. 84 [167 P. 514]; *Burdick* v. *City of San Diego* (1938), 29 Cal.App.2d 565 [84 P.2d 1064]; *Knowlton* v. *Hezmalhalch* (1939), 32 Cal.App.2d 419 [89 P.2d 1109]. However, in none of those cases was the court purporting to deal with a situation such as the one at bar, where the legislative policy has been expressly fixed by the state itself, and the execution of that policy has been specifically imposed by the state law on the board of supervisors as an administrative function. It would be beyond the powers of a board of supervisors to repeal or amend the state-declared policy; likewise, it is beyond the powers of the electorate of Los Angeles County by initiative procedure to repeal or amend such state policy. The board cannot escape the duty imposed upon it by the state through the medium of declining to act; neither can the electorate of the county take from the board the administrative functions delegated to it by the state. The situation is similar to that in *Riedman* v. *Brison* (1933), 217 Cal. 383, 387 [18 P.2d 947]. There the state Legislature, by general act, provided that the governing body of a city might submit to the electors of the city the proposition of withdrawing from a water district. This court denied a petition for mandate to compel the city clerk to place on the ballot an initiative proposal directing the council to submit such question to the electors, for "the legislature, in its general act, . . . designated the city council . . . as the state agency which may

initiate proceedings for the withdrawal of the municipality from the Metropolitan Water District. . . . The provisions of the charter of the city relating to the initiative apply only to its legislative acts which, unless otherwise authorized, can relate only to municipal affairs, of which this is not one. (*Hopping* v. *Council of City of Richmond*, 170 Cal. 605, 611 [150 P. 977].)''

The Hopping (*supra*, 170 Cal. 605; 170 Cal. 618), Burdick (*supra*, 29 Cal.App.2d 565) and Knowlton (*supra*, 32 Cal. App.2d 419) cases concerned the use of initiative or referendum to control the essentially municipal affairs of erection of municipal buildings by cities. In the Hill case (*supra*, 176 Cal. 84), the act of the board of supervisors which was involved was a ''resolution declaring the necessity for the construction of a new hall of records.'' The decision of the court that such resolution was subject to referendum was based on its view that: ''That a resolution such as is here under consideration is legislative in character is conclusively established by the decision in the Hopping case.'' But, as pointed out in the Hopping case (p. 611 of 170 Cal.), ''To allow it [the referendum] to be invoked to annul or delay executive conduct would destroy the efficiency necessary to the successful administration of the business affairs of a city. In many cases it would entirely prevent the exercise of the executive power necessary to carry out the acts determined upon by the legislative department.'' It is manifest from reading the Hopping decision that the basic elements of the acts of the city council which were held to be most material as fixing the character of its acts as legislative are not here involved in the acts of the supervisors; on the contrary those elements here were in large part resolved by the state Legislature when it determined the public purpose and policy of requiring the board of supervisors to furnish ''suitable quarters'' for the courts. Certainly the court in the Hopping case did not consider the question here involved, i. e., whether the electorate of a county, in a case such as this, may by the initiative interrupt and interfere with the performance by the supervisors of their state-imposed administrative duty to furnish suitable quarters for state courts. Insofar as any language used in the Hill case may imply that the acts of the board of supervisors with which we are here concerned are legislative and subject to the initiative, it is clearly contrary to the practical and efficient operation of the state-imposed plan of government, tends to defeat the state policy, and

should be, and is, overruled. *Nickerson* v. *San Bernardino County* (1918), 179 Cal. 518, 522 [177 P. 465], and *Jardine* v. *City of Pasadena* (1926), 199 Cal. 64, 71 [248 P. 225, 48 A.L.R. 509], are not in point. In those cases this court refused injunction to control the local governing body's power in connection with providing a site for a public hospital. The cases refer to that power as "legislative and discretionary," but they are not concerned with, and make no attempt to draw, a distinction between legislative and administrative action.

As pointed out in *Newsom* v. *Board of Supervisors* (1928), 205 Cal. 262, 269 [270 P. 676], "It has been recognized from an early date in the history of the state that in the exercise of their functions under particular statutes 'the board of supervisors is a special tribunal, with mixed powers— administrative, legislative and judicial' . . ." Where a series of acts by a board are all directed to the end of carrying out a duty imposed on the board by the law of the state, and where it is sought by a citizens' committee of the county to interrupt the process through repeal by the initiative of one or more of the steps theretofore taken by the board, the acts sought to be repealed are to be judged, as legislative or administrative, not as isolated acts but in their true relationship as a part of the entire project.

If the selection of sites of courts buildings were subject to referendum, the electors could nullify every determination of the board of supervisors to erect buildings for the courts and thereby nullify the legislative policy and prevent execution of the duty imposed upon the board of supervisors. Furthermore, a small group, or various small groups, of electors, by repeated initiative proposals for a change of site, could interfere with the supervisors' attempts to furnish quarters for the courts at any time, even when the period for referendum had passed. Thus, such small group or groups of electors could not merely place the board of supervisors in a strait jacket (see *Housing Authority* v. *Superior Court* (1950), *supra,* 35 Cal.2d 550, 559) but could interfere with the functioning of the courts by depriving them of the quarters which the supervisors were bound to, and in good faith sought to, furnish. This application of the initiative would be "inappropriate and impossible of operation" and would repeal "provisions of . . . state law vesting administrative and discretionary powers in the Board of Supervisors" (*Newsom*

v. *Board of Supervisors* (1928), *supra,* 205 Cal. 262, 269, 272, which held that the initiative method cannot be employed where compliance with the requirements of the general law calls for the exercise of the mixed administrative, legislative and judicial powers of the local legislative body and its various functions are so intermingled as to render the initiative entirely inconsistent and unworkable). ▪ The initiative or referendum is not applicable where "the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power, the practical application of which is essential . . ." (*Chase* v. *Kalber* (1915), 28 Cal. App. 561, 569-570 [153 P. 397] [improvement of city streets] ; see *Hunt* v. *Mayor & Council of Riverside* (1948), 31 Cal.2d 619, 628-630 [191 P.2d 426].) Similarly, where a state act specifies the steps to be taken by a local body in enacting legislation, an initiative measure cannot be validly adopted unless such steps are taken. (*Hurst* v. *City of Burlingame* (1929), 207 Cal. 134, 140 [277 P. 308] [zoning, lack of notice and hearing] ; *Galvin* v. *Board of Supervisors* (1925), 195 Cal. 686, 696-698 [235 P. 450] [toll bridge franchise, lack of hearing, notice to state engineer, etc.].)

It is to be observed also that difficulties resulting from the use of the initiative here proposed are apparent from a consideration of the requirements of the state Planning and Conservation Act (2 Deering's Gen. Laws, Act 5211c). That act requires that every city and every county adopt a master plan for the development of the area. (§ 10.) The plan may include, among other things, the locations and arrangement of public buildings. (§ 44.) The master plan is to be prepared and adopted by the planning commission of the political subdivision. (§ 35.) Before adopting or substantially amending the plan, the commission must hold a public hearing thereon. (§ 61.) The legislative body of the city or county shall adopt such parts of the master plan "as may practicably be applied to the development of the city or county for a reasonable period of time next ensuing" (§ 70) and shall "upon recommendation of the planning commission" determine reasonable means for putting it into effect (§ 71). Before recommending the plan or any amendment to the legislative body, the planning commission shall hold at least two public hearings, and before adopting the plan the legislative body shall hold at least one public hearing. (§ 72.) The legislative body shall not change the plan without referring the proposed change to the planning commission for a report

(§ 72) and the planning commission must hold public hearings on such proposed changes (§ 74). The legislative body shall not construct or authorize a public building in an area for which the plan has been adopted without submitting the location and character of such building to the planning commission for a report, and the legislative body can overrule the commission's disapproval of a proposed public building only by a two-thirds vote. (§ 73.)

The above prescribed procedure must be followed by the board of supervisors when it is proposed to change the site of a public building. (See *Newsom* v. *Board of Supervisors* (1928), *supra*, 205 Cal. 262, 270; see also *Johnston* v. *Board of Supervisors* (1947), 31 Cal.2d 66, 74 [187 P.2d 686].) There is no machinery provided for the electors as a whole to comply with the planning commission procedure, yet the law requiring the master plan, and compliance with it, makes no exception in favor of initiative-fixed sites. Thus the board would encounter further difficulty and delay if it were required to accept, and seek to fit into the master plan, as presumptively would be necessary in order to secure planning commission approval of, changes proposed from time to time by the electors in the site of courts buildings. And this difficulty and delay would constitute not merely an inconvenience to the supervisors, and a continuing check on their efforts to house the courts in accordance with the legislative direction of the state, but also, since the need for "suitable" court quarters is determined and unchallenged, it could result in continuing hindrance of the more efficient functioning of the courts.

All material contentions advanced by the proponents of the initiative ordinance are necessarily disposed of by our holding that such ordinance deals with matters which are not within the initiative function.

For the reasons above stated, it is ordered that the peremptory writ of mandate issue forthwith directing the respondent to omit the proposed initiative ordinance from the ballot.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Real Parties' in Interest petition for a rehearing was denied October 26, 1950. Carter, J., voted for a rehearing.