[Civ. No. 11031.   Third Dist.   Oct. 19, 1964.]

EDWARD J. VAGIM et al., Plaintiffs and Appellants, **v.**
THE BOARD OF SUPERVISORS OF THE COUNTY
OF FRESNO et al., Defendants and Respondents.

Vergil L. Gerard for Plaintiffs and Appellants.

Robert M. Wash, County Counsel, and Max E. Robinson, Deputy County Counsel, for Defendants and Respondents.

VAN DYKE, J.†—This is an appeal from a judgment denying a writ of mandate. Appellants challenge the validity of proceedings taken by the Board of Supervisors of Fresno County looking toward the construction upon county-owned property within the City of Fresno of a courthouse, and of other buildings for county purposes.

Within the City of Fresno the county owns a tract of land, about 15 acres in extent, to which it acquired title in 1874. Although the deed contained a provision "to be used for the erection of a courthouse thereon, and for other County purposes" the county acquired title in fee. Thereon in 1875, the county constructed a courthouse. Two wings were added in 1893, and the central portion was repaired, due to a fire in 1895. There have been no structural alterations since then. The county has made other use of its land. In 1893 a building was erected adjacent to the courthouse which was used as a county jail until 1959, when it was demolished and the land upon which it stood was converted to a parking area for county vehicles. A hall of records was erected on one side of the courthouse in 1937, and in 1942 a sheriff's building and county jail was constructed on the opposite side. Between 1950 and 1960 annexes were added to these buildings.

During the years the population of the county has increased from something under 10,000 to 365,945 as of 1960, and it is estimated that in 1970 there will be nearly 500,000 people living in the county and that by 1980 the population will have increased to over 650,000. The county's first superior

†Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

court was established in 1879 and departments have been added as the population increased, until in 1963 there were seven departments in that court. The first municipal court was established in 1952 with four departments, and in 1963 a fifth department was added.

As early as 1950 the county board of supervisors called for bids for remodeling the courthouse to better accommodate the courts of the county. The bids received ranged from $697,000 to $802,500. Because of an earthquake in 1952 the board requested a structural engineering survey of the courthouse, which resulted in a report declaring that the building was not a safe earthquake-resistant structure. In 1959 the Fire Marshal of the City of Fresno made an inspection to determine whether the courthouse was safe for public use, and reported that to correct existing fire hazards would cost an estimated $844,250. The Fresno County Public Works Department filed an engineering report in February 1962, estimating the cost of functional rehabilitation of the courthouse to be $700,000, this in addition to the correction of existing fire hazards, or a total rehabilitation cost of $1,544,250. In November 1962 the board called for architectural plans and specifications for providing a new courthouse and other needed county buildings and decided upon a plan or scheme, known in these proceedings as "scheme 2-N" which called for the construction of a new courthouse building, new sheriff's building, new administration building, and the demolition of the existing courthouse, all at an estimated cost of $6,672,351. After a public hearing and consideration, the board, on February 5, 1963, approved scheme 2-N by resolution. The board applied to the Federal Housing and Home Finance Agency for a federal grant in aid of $1,949,300, and in August following received a grant contract for that amount. One of the conditions imposed was that the county should initiate on-site work within 120 days. This condition was met and the county is proceeding with its building program.

In February 1963 a committee, whose chairman is appellant Vagim, was organized and later complied with the provisions of the Elections Code pertaining to circulation and publication of an initiative petition to enact a proposed ordinance, reading as follows:

"THE PEOPLE OF THE COUNTY OF FRESNO, DO ORDAIN AS FOLLOWS: THAT THE EXISTING COUNTY LAND AREA LOCATED WITHIN THE CITY OF FRESNO, BOUNDED BY FRESNO STREET. VAN NESS AVENUE, TULARE STREET AND M STREET, COM

MONLY KNOWN AS THE COURTHOUSE PARK, SHALL HEREAFTER BE PRESERVED FOR USE AS A PARK AREA ONLY: THAT FURTHER CONSTRUCTION OF BUILDINGS, ADDITIONAL PARKING AREAS OR ENCROACHMENT OF ANY KIND BE, AND IS HEREBY, PERMANENTLY PROHIBITED: THAT THE BUILDING COMMONLY KNOWN AS THE FRESNO COUNTY COURTHOUSE, ALREADY OCCUPYING SPACE WITHIN THE PARK, BE PERMANENTLY MAINTAINED AND PRESERVED FOR CONTINUED USAGE BY VARIOUS PUBLIC AGENCIES.''

On September 3, 1963, this petition was submitted to the board of supervisors which, by resolution, set November 5, 1963, as the time for a special election on the proposed ordinance. One Joseph O. Mueller began mandate proceedings against the county clerk, naming the committee and others as real parties in interest, for the purpose of obtaining a writ compelling the county clerk to omit the proposed initiative ordinance from the ballot. The trial court granted the writ and the matter was appealed, resulting in the decision in *Mueller* v. *Brown*, 221 Cal.App.2d 319 [34 Cal.Rptr. 474], denying the writ.

■ Speaking generally, a county is a legal subdivision of the state. It is neither a private nor a public corporation, nor, strictly speaking, a corporation of any kind. It is merely a political subdivision of the state for purposes of government and the Legislature has the inherent power to prescribe the powers, duties and obligations of such a subdivision in exercising governmental functions on behalf of the state. (13 Cal.Jur.2d, Counties, § 2, pp. 347-348.) ■ Being a mere governmental agency of the state, the property entrusted to a county's governmental management is public property, the proprietary interest in which belongs to the public. Legal title held by a county is held in trust for the whole public. In the absence of constitutional restriction, the Legislature has full control of property so held and the state may dispose of such property without the consent of the county and without compensating it. (*Id.*, § 52, p. 401.)

■ Again speaking generally, the functions of a county are such as have been or may be imparted to it by the state. Section 25351 of the Government Code has laid upon the counties a duty to construct, equip and repair many kinds of buildings for public use, among them buildings for courthouses and such other buildings as are necessary to carry out the work of the county government. (*Simpson* v. *Hite*, 36 Cal.2d 125, pp. 129-130 [222 P.2d 225] and cases cited.) It is patent, therefore, that the actions of the Board of Super-

visors of Fresno County in the matter before us were actions responsive to duties cast upon the county by specific statutory provisions.

■ Appellants contend here, as they did in the trial court, that the area within the county-owned plot, commonly known as Courthouse Park, not covered by existing courthouse and county buildings, had been irrevocably dedicated as a public park by previous action of the board of supervisors; and cannot be used for any other purpose. Reliance is placed on a number of ordinances. In 1891 an ordinance was passed which provided that "The plot of land surrounding the Court House of the County of Fresno, consisting of about 15 acres more or less is hereby declared to be a Public Park for the use and benefit of the Public." A later ordinance provided special regulations for use of the park, among other things reserving a part for exclusive use by women and children. By still another ordinance it was declared that the land "is hereby set apart and declared to be a public park for the use and benefit of the public, to be known as the Court House Park." These ordinances do not irrevocably dedicate any part of the land for park purposes. The word "dedication" is not even used in the ordinances, the language generally being that the land shall be a public park, indicating no more than that for regulatory purposes the area shall be devoted to use as a park with provisions for specific use of parts of the park area. Even if it be considered that these ordinances evince an intent to dedicate irrevocably, the board could not have done so. "It has often been decided that when lands are acquired by a governmental body in fee and dedicated by statute to park purposes, it is within the legislative power to change the use [citations], or to make other disposition of the land." (*Reichelderfer* v. *Quinn,* 287 U.S. 315 [53 S.Ct. 177, 77 L.Ed. 331, 83 A.L.R. 1429]; see also *Ritzman* v. *City of Los Angeles,* 38 Cal.App.2d 470 [101 P.2d 54]; *Spinks* v. *City of Los Angeles,* 220 Cal. 366 [31 P.2d 193].) One of the reasons for the foregoing rule as noted in the cases cited is that a public body charged with the administration of public lands cannot by its acts tie the hands of those who come later to exercise the authority. The court said in *Reichelderfer* v. *Quinn, supra* (77 L.Ed at p. 333 [287 U.S. at p. 318, 53 S.Ct. at p. 178, 83 A.L.R. at pp. 1431-1432]): "By dedicating the lands thus acquired to a particular use, Congress declared a public policy, but did not purport to deprive itself of the power to change that policy

by devoting the lands to other uses. The dedication expressed no more than the will of a particular Congress which does not impose itself upon those to follow in succeeding years." Said the court further (77 L.Ed. at p. 334 [287 U.S. at p. 319, 53 S.Ct. at p. 179, 83 A.L.R. at p. 1432]): "[I]f the enjoyment of a benefit thus derived from the public acts of government were a source of legal rights to have it perpetuated, the powers of government would be exhausted by their exercises."

Responsive to the contentions now being discussed, the trial court found that "the Fresno County ordinances relating to the property referred to as Courthouse Park . . . are simply police ordinances designed to regulate the use thereof by the general public. The ordinances . . . are . . . not binding on the County itself, and the Board of Supervisors was not obligated to amend or repeal [the ordinances] before authorizing the construction of the proposed new courthouse." These findings are supported both by the facts and by applicable law and we affirm them.

Appellants further contend that the county violated state planning laws by authorizing a public building without planning commission consideration, as directed by the State Conservation and Planning Law. (Gov. Code, § 65500 et seq.) More particularly the claim is that (a) a plan known as the Fresno-Clovis Metropolitan Plan is a master plan of general type and subject to and controlled by the State Conservation and Planning Law; and the supervisors did not submit the matter of the proposed new courthouse and county buildings to the county planning commission as required by said law; (b) that the county, by having its administrator prepare and file in 1960 a document known as the "Mobley Report," and by thereafter resolving to build the structures called for under said scheme 2-N, had adopted a master plan subject to and controlled by the State Conservation and Planning Law; (c) that the adoption of scheme 2-N was in itself and standing alone a master or general plan under the State Conservation and Planning Law and that proper and necessary procedural steps were not taken under the said law. We will consider these contentions separately.

First, as to the Fresno-Clovis Metropolitan Plan, it is to be observed that it contains no provisions on the element of public buildings. Section 65462 of the Government Code prescribes the elements that must be included in a master plan as being (a) a land use element which designates the proposed general distribution and general location and extent

of the uses of land within the planning area for housing, business, industry, recreation, education, public buildings and grounds, and other categories of public and private land uses, (b) a circulation element, (c) a statement of the standards of population density and building intensity recommended for the various districts and (d) supporting maps, diagrams, charts, etc. An examination of the copy of the so-called Fresno-Clovis plan in evidence demonstrates that it is a vague and generalized document. Perhaps it might be considered as in some way prescribing the land use element for the county-owned land within Fresno city, but it is apparent that it contains no public building element. While not statutorily required in a master plan, such an element may optionally be contained therein. Such is the purpose and effect of the provisions of section 65470 of the Government Code, which reads as follows:

"A master or general plan may include a public buildings element of the plan, showing locations and arrangements of civic and community centers, public schools, libraries, police and fire stations, and all other public buildings, including their architecture and the landscape treatment of their grounds."

Assuming the Fresno-Clovis Plan to be a master plan, it cannot be said that it contains any provisions relative to any public buildings or structures which may, by proper authority, be erected within the county-owned plot within the city, and therefore it was not required that the supervisors must proceed by first submitting their plans for public buildings within the county's land to the county planning commission.

However, in no event was the county board required to submit its proposed action to a planning commission. As we have hereinbefore said, the state, acting in its sovereign capacity, has laid upon counties the duty of providing buildings and facilities for the operation of courts, and of providing buildings for county use. The counties, when so acting in the performance of the duties cast upon them, are acting purely as agencies of the sovereign power, or, putting it another way, such actions are the actions of the sovereign through its specially empowered agency. Therefore, as said in *Hall* v. *City of Taft,* 47 Cal.2d 177, at page 183 [302 P.2d 574]:

". . . When it [the state] engages in such sovereign activities as the construction and maintenance of its buildings, as differentiated from enacting laws for the conduct of the public

at large, it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation. Section 11 of article XI of the state Constitution, *supra,* should not be considered as conferring such powers on local government agencies. Nor should the Government Code sections which confer on a city the power to regulate the construction of buildings within its limits (see Gov. Code, §§ 38601, 38660) be so considered. It is said in *In re Means,* 14 Cal.2d 254, 258 [93 P.2d 105], holding that a state employee working on a state structure in a city need not meet the requirements of a city charter provision: 'If one who has been employed by the state may not work on state property within a municipality without the consent of the municipality obtained after examination, the city has, in effect, added to the requirements for employment by the state, and restricted the rights of sovereignty . . . .' "

In *Town of Atherton* v. *Superior Court,* 159 Cal.App.2d 417, 428 [324 P.2d 328], the court said, after quoting the foregoing from *Hall* v. *City of Taft*: "If, as the *Hall* case holds, the construction and maintenance of a school building is a sovereign activity of the state, it is obvious that the location and acquisition of a school site is necessarily and equally such an activity. Obviously, too, neither the Constitution nor the Legislature has consented to a municipal regulation of school sites. As said in *Kentucky Institution for Education of Blind* v. *City of Louisville,* 123 Ky. 767 [97 S.W. 402, 8 L.R.A. N.S. 553], as quoted in the *Hall* case (p. 183) : ' " ' The principle is that the state when creating municipal governments does not cede to them any control of the state's property situated within them, nor over any property which the state has authorized another body or power to control . . . . How can the city ever have a superior authority to the state over the latter's own property, or in its control and management? From the nature of things it cannot have.' " '

" . . . . . . . . . . . . . 

"Under the statutes, the state has in nowise ceded to the municipalities its sovereign right to locate school sites. On the contrary, the state has expressly granted the power of location to its agencies, the school districts."

It must equally be said the state has not ceded to cities or to planning commissions the sovereign right to locate the site for courthouse buildings or for buildings for county use, or the right to in any wise control or manage the county's execution of its statutory duties. There was therefore no requirement that the county, as such, and as an agency of

the state, consult with either the county planning commission or the city planning commission in any manner affecting the location or the propriety for construction of a new courthouse or new county buildings upon the county land.

■ Taking up next appellant's contentions concerning the so-called Mobley Report, it is sufficient to say that, as found by the trial court, there was no proof that this so-called Mobley Report was ever adopted by the supervisors as a master plan or adopted at all. It was prepared by the county administrator at the request of the supervisors, and filed, along with a number of other reports. To request and file reports by the county administrator on various county subjects is apparently more or less routine. The "Mobley Report" contains some suggestions for a long-term building plan for the county, a part of which has in fact been carried into effect, but no official action has been taken, according to the evidence, to adopt the report as an official plan of any nature. The trial court's finding that the "Mobley Report" had not been adopted as a master plan by anything done by the board in respect thereto is supported by the evidence.

■ Turning next to the third contention that, by the adoption of scheme 2-N, the county adopted a master plan, we find no merit in this contention. The so-called scheme 2-N is no more than a plan to presently construct upon the county's property a courthouse and related facilities, to be followed at some time in the future by the construction of other county buildings. Such action cannot be referred to any intent on the part of the board to thereby adopt a master or general plan. The scheme has none of the attributes of a master or general plan, nor any of the elements thereof. It is obviously not intended as such and its adoption required no formal procedures pursuant to the Conservation and Planning Act. Upon the evidence before it, the trial court so found and the evidence supports the finding.

■ Finally, petitioner seeks to relitigate the matters determined by the decision of the District Court of Appeal for the Fifth Appellate District in the case of *Mueller* v. *Brown, supra.* Petitioners were active participants therein as real parties in interest. Their petition for the enactment by the board, or at an election, of the proposed ordinance hereinbefore quoted met no opposition from the board itself. On the contrary, although refusing to adopt the ordinance by its own resolution, the board elected to place it before the People at a special election. This, of course, was a decision within their

discretion. But in *Mueller* v. *Brown, supra,* the petitioner therein, as against appellants here, contended that the subject matter of the proposed ordinance was not legislative in character and therefore not within the purview of the laws governing initiative and referendum. That issue was determined adversely to appellants. Herein appellants still argue that the decision was wrong, but that is no longer open to question. However, appellants urge further that, notwithstanding they could not achieve their underlying purpose through the initiative process, the board of supervisors ought, in the exercise of a proper discretion, to adopt the proposed ordinance as their own. Assuming that the board could do so, whether it should or not is clearly a matter within the board's discretionary field and it certainly cannot be said that by refusing the request of appellants the board has abused its discretion.

The judgment is affirmed.

Pierce, P. J., and Friedman, J., concurred.