SOUTHWEST DIVERSIFIED, INC.,
Visitacion Associates, Plaintiffs,

v.

The CITY OF BRISBANE, et
al., Defendants.

No. C–85–3334 EFL.

United States District Court,
N.D. California.

Aug. 28, 1986.

Paul R. Hamilton, Karen J. Lee, Memel Jacobs, Pierno, Gersh & Ellsworth, Los Angeles, Cal., James Longtin, Westlake Village, Cal., Special Counsel, Burton J. Goldstein, Goldstein, Barceloux & Goldstein, San Francisco, Cal., for plaintiffs.

Howard N. Ellman, John Hoffman, Ellman, Burke & Cassidy, San Francisco, Cal., for plaintiff Visitacion Associates.

Ann Broadwell, Thomas R. Adams, Adams, Broadwell & Russell, San Mateo, Cal., Robert L. Henn, Thomas J. Mellon Jr., Michele R. McNellis, Henn, Etzel & Mellon, Inc., San Francisco, Cal., Carl McConnell, Packard, Mellberg & McConnell, Palo Alto, Cal., for all defendants.

Alice Q. Howard, Oakland, Cal., for Non-Party Friends of Endangered Species.

Michael Freund, Berkeley, Cal., for Non-Party Alice Howard.

Jean K. McCown, Blase, Valentine & Klein, Palo Alto, Cal., for Committee To Save San Bruno Mountain.

## ORDER STAYING EXERCISE OF JURISDICTION PENDING RESOLUTION OF UNSETTLED STATE LAW ISSUES

LYNCH, District Judge.

Mindful that abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47

L.Ed.2d 483 (1976) (quoting *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959)); *see also Murray v. Carrier*, — U.S. ——, 106 S.Ct. 2678, 2679, 91 L.Ed.2d 427 (1986) (Brennan, J. dissenting), the Court has concluded that the circumstances of this case require abstention. For the reasons discussed below, the Court will postpone the exercise of its jurisdiction over this case until the parties have obtained a state court resolution of the unsettled issues of California law that can obviate or delimit the determination of the constitutional issues this case presents.

### BACKGROUND

The gist of plaintiffs'[1] 110–page Second Amended Complaint is that defendants[2] have reneged on an agreement and illegitimately exercised municipal authority to prevent the developers from implementing a 1,250–unit condominium development on the Northeast Ridge of San Bruno Mountain. More particularly, the developers contend that the City adopted a new Housing Element containing a growth management program preventing them from building the development in a financially feasible amount of time and allowing the City to redetermine the number of units that can be constructed. The developers also contend that they have been prevented from filing applications for the further city approvals necessary for beginning construction because the City has enacted ordinances that allow the processing of such applications to be forever delayed and has required the developers to pay an extortionate sum in order for the application to be processed. The developers allege that the City has engaged in other nefarious activities designed to frustrate the developers so that they will abandon their plans for a development in Brisbane.

The developers contend that they are entitled to proceed with their development because the City has already agreed to the proposed development and has given assurances that it would not be obstructed. The purported agreement and assurances are allegedly found in representations made by the City at the pre-annexation hearings before the San Mateo County Local Agency Formation Commission and in the written document entitled "Agreement with Respect to the San Bruno Mountain Area Habitat Conservation Plan" ("HCP Agreement"). The HCP Agreement was entered into by the City, the County, Southwest Diversified, Inc., the Fish and Wildlife Service, and other municipalities, agencies, and landowners, as a prerequisite to obtaining a permit under the Endangered Species Act, 16 U.S.C. sections 1531–1543 ("ESA" or "Act").

The permit was one of many government approvals needed for the development to occur. Because an endangered species, the Mission Blue Butterfly, inhabits the site of the proposed development, no development could occur unless a permit allowing the "taking" (i.e., killing or harming, *see* 16 U.S.C. section 1532(19) (defining "take")) of some of the butterflies was obtained from the federal government. ESA section 10(a); 16 U.S.C. section 1539. A prerequisite to obtaining such a permit was the creation of a conservation plan by which the endangered species would be protected. 16 U.S.C. section 1539(a)(2)(A). The HCP Agreement was formulated in conjunction with establishing the habitat conservation plan. *See Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 979–81 (9th Cir.1985) (describing the history of the conflict over the development of San Bruno Mountain in the context of approving the issuance of the permit).

1. Plaintiff Southwest Diversified, Inc. is a corporation seeking to develop property on the Northeast Ridge of San Bruno Mountain; plaintiff Visitacion Associates is a partnership that currently owns the property. Notwithstanding the distinction, they will sometimes be referred to as the "developers."

2. Defendants include the City of Brisbane, the Brisbane City Council, and three individual members of the Council. Notwithstanding the distinction, the defendants will sometimes be referred to as the "City."

The County of San Mateo ("County") was allowed to intervene in the case because it alleged that as the operator and administrator of the Habitat Conservation Plan, it had an interest in assuring the execution of the HCP Agreement, which provides for funding of the Habitat Conservation Plan from the development of the Northeast Ridge. The County contends that the City was contractually bound to allow the development to proceed and that its failure to do so constitutes a breach of contract and impairment of a contractual obligation.[3]

In sum, the County and the developers claim to have acquired vested rights to a development by contracting with the City in the process of obtaining a federal permit that was one of many government approvals needed for proceeding with the development. While the suit is redolent of a simple breach of contract action, the County and developers have urged that bargaining in the shadow of the federal permit has not only created vested rights that have been infringed unconstitutionally, but has also "federalized" this local land-use dispute.

## DISCUSSION

### I. *Pullman* Abstention

■ "[I]n order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication," a district court may postpone the exercise of jurisdiction under the doctrine of *Pullman* abstention. *Pearl Investment Company v. City and County of San Francisco,* 774 F.2d 1460, 1462 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986) (quoting *Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965)); *see Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Resort to the exceptional doctrine is justified only when a case satisfies each of the following three criteria:

(1) The complaint touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open.

(2) Such constitutional adjudication plainly can be avoided if a determinative ruling on the state issue would terminate the controversy.

(3) The possibly determinative issue of state law is doubtful.

*Pearl Investment,* 774 F.2d at 1463 (citing *Canton v. Spokane School Dist. No. 81,* 498 F.2d 840, 845 (9th Cir.1974) (quoting *Pullman,* 312 U.S. at 498, 61 S.Ct. at 644)). Each criterion is satisfied in this case.

The Ninth Circuit has repeatedly held that "land-use planning questions 'touch a sensitive area of social policy' into which the federal courts should not lightly intrude." *Pearl Investment,* 774 F.2d at 1463 (citing *Bank of America v. Summerland County Water Dist.,* 767 F.2d 544, 546 (9th Cir.1985); *Kollsman v. City of Los Angeles,* 737 F.2d 830, 833 (9th Cir. 1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *C.Y. Development Co. v. City of Redlands,* 703 F.2d 375, 377 (9th Cir.1983); *Santa Fe Land Improvement Co. v. City of Chula Vista,* 596 F.2d 838, 840 (9th Cir.1979); *Sederquist v. City of Tiburon,* 590 F.2d 278, 281 (9th Cir.1978); *Rancho Palos Verdes Corp. v. City of Laguna Beach,* 547 F.2d 1092, 1094–95 (9th Cir.1976)).

This land-use case is no exception. At issue is the conduct of local political officials and the constitutionality of local ordinances that affect the use of land in Brisbane. Because much of the developers' complaint is aimed at the City's implementation of the new Housing Element of its General Plan, Ninth Circuit precedent compels the conclusion that the first criterion is

---

**3.** The County contends that the agreement and assurances are to be found in the following: "(1) a Letter of Understanding, dated June 15, 1980, pertaining to joint COUNTY and CITY planning ...; (2) a Specific Plan ...; (3) a Tentative Subdivision Map ...; (4) a Habitat Conservation Plan ...; (5) an ... HCP Agreement; (6) a ... Section 10a Permit; (7) a Property Tax Transfer Agreement...." Complaint in Intervention, at 4.

met. *See Pearl Investment*, 774 F.2d at 1463–64 (first criterion met where most of complaint aimed at application of city's Residence Element). The Court's conclusion is reinforced by the observation that one of the remedies sought is de-annexation of Brisbane property. Such an intrastate land dispute certainly implicates sensitive and local policy concerns.

The second criterion is couched in terms of "avoiding" constitutional questions and "terminating" the controversy. However, the law is clear in this Circuit that the second criterion is satisfied if the resolution of state law issues "may obviate, in whole *or in part*, or *alter the nature of* the federal constitutional questions." *C–Y Development*, 703 F.2d at 379 (emphasis in original); *accord Pearl Investment*, 774 F.2d at 1464 (abstention proper where state law issues might determine or *narrow* federal constitutional issues); *Bank of America*, 767 F.2d at 547 (same).

The developers have alleged substantive due process violations in Claim 2 (captioned "Deprivation of Vested Rights Held Under a Federal Permit"), Claim 4 (taking), and Claim 6 (inverse condemnation). In claim 3 the developers allege a violation of the contract clause, U.S. Const. art. 1 section 10 cl. 1; the County also alleges a contract clause violation as their sole constitutional claim. The developers have further alleged a deprivation of procedural due process (Claim 4), and a denial of equal protection (Claim 5). As discussed below, there are state law issues in this case that will significantly alter, and possibly eliminate, all of these constitutional claims.

In *Pearl Investment*, the Ninth Circuit defined the third criterion:

> Uncertainty for purposes of *Pullman* abstention means that a federal court cannot predict with any confidence how the state's highest court would decide an issue of state law.... Resolution of an issue of state law might be uncertain because the particular statute is ambiguous, or because the precedents conflict, or because the question is novel and of

sufficient importance that it ought to be addressed first by a state court.

*Pearl Investment*, 774 F.2d at 1465. As explained below, state law issues that could narrow the constitutional claims are uncertain.

II. Uncertainty in California Vesting Law Compels Abstention

The gravamen of the developers' and the County's case is that the City agreed to allow the development to proceed and now is estopped, or contractually prevented, from making changes in its laws so as to prevent the development from proceeding as planned. In essence, the contention is that the developers have a vested right to construct the 1,250–unit condominium development. Consequently, the law of vesting figures prominently in the ultimate resolution of the case and in the resolution of each constitutional issue.

A. Vesting is Governed by State, Not Federal, Law

Plaintiffs do not dispute that vesting law is important to the resolution of this case, but they argue that the Court can and should reject California vesting law and fashion a federal common law of vesting. Were vesting a matter of federal common law, abstention because of its uncertainty would be inappropriate. However, having considered the supplemental briefs and argument addressed to this issue, the Court now concludes that California law governs the issue of vesting.

Federal common law may be created where "a federal rule of decision is necessary to protect uniquely federal interests ... or where Congress has given the Courts power to develop substantive law." *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1980); *Sample v. Johnson*, 771 F.2d 1335, 1345 (9th Cir. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986); *accord* Merrill, *The Common Law Powers of Federal Courts*, 52 U.Chi.L.Rev. 1, 46–47 (1985) (federal common law justified where the intent to authorize federal common law

making is discernible in a federal text, where federal common law is necessary to effectuate a federal policy that can be derived from the intentions of the drafters of a federal text, or where lawmaking has been delegated to the courts in a reasonably circumscribed manner).

■ There is no contention that Congress authorized the development of substantive law in this case, thus the question is whether there is a uniquely federal interest to be protected here. Plaintiffs have articulated the federal interest as the "protection [and] preservation of endangered species." Transcript of the Hearing of June 13, 1986 at 4; *see also* 16 U.S.C. section 1531 (purposes and policy of ESA). The Court finds such an interest insufficient to empower the Court to create a federal common law of vesting.

Federal courts have long been reluctant to displace state laws relating to real property. *See State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378, 97 S.Ct. 582, 590, 50 L.Ed.2d 550 (1977); *Cortese v. United States*, 782 F.2d 845, 849 (9th Cir.1986). The Supreme Court has recognized that state law as to what constitutes real property should only be displaced where the state law discriminates against the federal government, or is patently counter to an articulated federal intent. *See Reconstruction Finance Corporation v. Beaver County*, 328 U.S. 204, 210, 66 S.Ct. 992, 995, 90 L.Ed.2d 1172 (1946). As explained below, neither of those factors is present here.

*United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), exemplifies the exceptional circumstances necessary for a court to displace state law with a federal rule of decision. In that case the federal government was the plaintiff and was suing to quiet title to land it had acquired under authority of a congressional act. *Id.* at 592, 93 S.Ct. at 2396. The state law that was displaced was hostile to the federal government in that it singled out land acquired by the federal government and made the reservation of mineral rights in such land imprescriptible. *Id.* at 584, 93 S.Ct. at 2392.

In contrast, the instant case pits local government against private entities without putting the federal interest[4] at risk. The federal government is not a party,[5] *see id.* at 603 n. 20, 93 S.Ct. at 2402 n. 20 (distinguishing *Wallis v. Pan American Petroleum Corp*, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966), in part on the grounds that the controversy was between two private parties), and the rights and duties of the federal government under the section 10(a) permit that has been alleged to be a source of the developers entitlement to develop is, at best, a peripheral issue. Furthermore, the interest in protecting endangered species is only marginally involved in this litigation.[6] Consequently, the Court lacks the power to create federal common law on the issue of vesting in this case. *See Miree v. DeKalb County*, 433 U.S. 25, 28–32, 97 S.Ct. 2490, 2493–2495, 53 L.Ed.2d 557 (1977) (creation of federal common law inappropriate where

---

4. The interest in protecting endangered species is not uniquely federal; it is an interest shared by the State of California. *See* Cal.Fish & Game Code sections 2050–2054 (West 1984).

5. The federal government has filed an *amicus* brief opposing abstention, but has not deemed its interests sufficiently implicated to warrant intervention. The Court understands that plaintiffs have filed a motion attempting to join agencies of the federal government as defendants. The Court's conclusion that the federal interest is not powerful enough to require federal common law would not be altered even if the federal government were a party to the litigation, for federal interests would still rest at the periphery

of this case. *See United States v. Yazell,* 382 U.S. 341, 348–49, 86 S.Ct. 500, 504–05, 15 L.Ed.2d 404 (1966) (federal common law not warranted even where federal government suit to collect on defaulted note was stymied by Texas law of coverture).

6. Should the developers win and the development proceed, some of the butterflies will be "taken," but the species will receive the benefit of the Habitat Conservation Plan; however, if the development does not proceed, then there will be no taking of butterflies which is what the Habitat Conservation Plan was designed to off-set and justify.

suit was between private litigants and outcome would have no direct effect on United States).

■ Determining whether or not to displace state law with federal common law requires finding not only that the court is empowered to create common law, but also that it would be appropriate to select as the federal rule of decision some law other than that of the state. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979); *Little Lake Misere,* 412 U.S. at 594, 93 S.Ct. at 2397; *United States v. Pastos,* 781 F.2d 747, 751 (9th Cir.1986); *see also* Field, *Sources of Law: The Scope of Federal Common Law,* 99 Harv.L.Rev. 881, 885–87 (1986) (describing two-prong approach to analysis of whether federal common law governs an issue). The Court's conclusion that it is not empowered to make federal common law is supported by the following balance of interests analysis indicating that even if the Court had the power to make common law, the federal rule of decision to be implemented would most likely be California's law of vesting.

Determining whether to fashion a new rule of decision or borrow the law of the state requires a balancing of state and federal interests. However, "the scales of the balance are weighted in favor of borrowing state law...." *United States v. California,* 655 F.2d 914, 917 (9th Cir. 1980). "[N]ormally ... a significant conflict between some federal policy or interest and the use of state law ... must ... be specifically shown." *Wallis,* 384 U.S. at 68, 86 S.Ct. at 1304.

Plaintiffs contend that a need for uniformity in vesting law is important to implementing the policies of the Endangered Species Act. The Court disagrees. The Act itself not only tolerates, but encourages, inter-state diversity in the pursuit of its objectives. *See* 16 U.S.C. section 1535(c), (f) ("Cooperation with States"). The narrow federal interest of facilitating long-term conservation plans [7] might be served by a uniform national law of vesting. However, long-term conservation plans are but one way of satisfying the requirements for a section 10(a) permit. Consequently, it is difficult to see how a uniform vesting law is needed to accomplish the interest of protecting endangered species. A generalized plea for uniformity cannot substitute for concrete evidence that adopting state law would adversely affect a federal interest or program. *Kimbell Foods,* 440 U.S. at 730, 99 S.Ct. at 1459.

Nor can it be said that the California law of vesting frustrates the federal policy of safeguarding endangered species. As discussed below, the Court finds that California vesting law is uncertain and cannot predict whether California's Supreme Court would find that the developers had acquired vested rights in this case. Nevertheless, assuming the vesting law to be as restrictive as is plausible, the law cannot be

---

**7.** The Court does not discern from the legislative history of the Act a statement of federal policy regarding long-term planning that overrides the interest of local governments in exercising land-use controls. The legislative history of the amendment to the Endangered Species Act that allows for section 10(a) permits to be issued when a conservation plan is formed says that the amendment should be used to "encourage creative partnerships between the public and private sectors and among governmental agencies ..." H.R.Conf.Rep. No. 97–835, 97th Cong., 2d Sess. *reprinted in* 1982 U.S.Code Cong. & Ad.News 2807, 2860, 2871, and that the provision may be used to approve conservation plans which provide long-term commitments regarding conservation. *Id.* In short, the Amendment serves much the same purpose as the California

Development Agreement Statute (discussed below at 21): it allows for a long-term program to be undertaken without fear that a needed approval will be withdrawn. Although the ESA removed an impediment to long-term plans, the Act does not now *require* long-term plans. The legislative history speaks in terms of a partnership with the public sector and government agencies; such language suggests that the laws and policies of the local governments are to be respected in any long-term plan. "Even where there is related federal legislation in an area as is true in this instance, it must be remembered that 'Congress acts ... against the background of the total *corpus juris* of the states....'" *Wallis,* 384 U.S. at 68, 86 S.Ct. at 1304 (quoting Hart & Wechsler, The Federal Courts and the Federal System 435 (1953)).

said to frustrate the federal policy of protecting endangered species.

Under the narrowest possible view of California vesting law, the developers acquired no vested right to develop because they did not obtain a building permit, *Avco Community Developers, Inc. v. South Coast Regional Commission,* 17 Cal.3d 785, 791, 132 Cal.Rptr. 386, 553 P.2d 546 (1976), *cert. denied,* 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1977), or a vesting tentative map, *see* Cal. Gov't Code section 66498.1 (West Supp.1986), and they were not proceeding, or purporting to proceed, under the California Development Agreement Statute. Cal.Gov't Code sections 65864–65869.5 (West 1983 & Supp.1986); *see generally,* Sigg, *California's Development Agreement Statute,* 15 Sw.L.Rev. 695 (1985). Even assuming such is the law in California, the Court cannot conclude that California's vesting law is hostile to endangered species protection.

At worst, the "building permit rule" complicates the negotiation of long-term habitat conservation plan agreements such as those entered into here by leaving the entire agreement subject to the further exercise of municipal land-use controls. However, the California law of vesting is not limited to the "building permit rule." The Development Agreement Statute allows for a developer to receive precisely the long-term assurances the developers claim were received here, and which are needed for long-term plans. *See* Sigg, *supra,* at 708–09. Thus, California vesting law provides for the formation of long-term conservation plans and cannot be said to be hostile to any federal interest or policy in the Endangered Species Act.

Even if California did not provide for Development Agreements, the Court would not conclude that the "building-permit rule" is hostile to the federal policy of the Endangered Species Act. Some would argue that any California law that thwarted development is likely to serve the interests of conservation and, therefore, be consistent with the Act. However, the Court acknowledges that some developments may aid species preservation when, as here, they provide funding for a habitat conservation plan in an area where the habitat would ultimately be destroyed even were there no development. Nevertheless, the Court does not discern from the legislative history of the Act a strong federal policy favoring long-term assurances.[8] The suggestion of such a federal interest is not significant enough to overcome the powerful state interest, embodied in the "building permit rule," of guaranteeing that buildings are constructed in accordance with modern health, safety and welfare regulations. *See Avco,* 17 Cal.3d at 797–98, 132 Cal.Rptr. 386, 553 P.2d 546.

State law of vested property rights has very little to do with protecting endangered species. There has been no contention that species could not be protected, or even that section 10(a) permits could not be issued, under a regime that required a building permit in order to acquire a vested right. Where, as here, the law allows for long-term assurances as to local land use controls, it cannot even be said that the state vesting law negatively affects a federal predilection for encouraging long-term conservation plans. Under these circumstances, the Court concludes that there is not a sufficient clash between federal and state interests to warrant usurping state law with a federal rule of decision.

In sum, vesting is a matter of California law, and, as explained below, it affects each of the federal constitutional issues in this case.

---

**8.** The Court is aware that the HCP and HCP Agreement in this case has been described as a prototype for others. 1982 U.S.Code Cong. & Ad News 2860, 2872–73. That this is an exemplar does not mean that it is unimpeachable. The resolution of this litigation may indicate that further federal legislation is needed if courts are to deduce an intent to override state law. *Cf.* 29 U.S.C. section 1144(a) (ERISA supersedes conflicting state law of employee benefits). Or it may indicate that state laws need changing if parties are to obtain the long-term assurances from state government that the federal government is willing to give under the ESA.

## B. Vesting Law Affects Each Constitutional Issue

### 1. Substantive Due Process and Taking

■■ The fourteenth amendment guarantee of due process and the fifth amendment guarantee against uncompensated takings attach only to property interests. Property interests are not created or defined by the Constitution; "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." [9] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984); *Richmond Elks Hall Assn. v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1331 (9th Cir.1977) ("In determining what property rights exist and therefore are subject to taking under the Fifth Amendment, federal courts look to local state law."). Consequently, state law determining when a right vests such that a property interest is recognized is crucial to ascertaining whether there has been a deprivation of property without due process or whether there has been a taking of property without just compensation. *See* 5 B. Witkin, *Summary of California Law*, 3572–74 (1974).

Similarly, whether a taking of property has occurred depends in part on whether the City has interfered with a reasonable, investment-backed expectation. *Monsanto*, 104 S.Ct. at 2875. Whether or not an investment-backed expectation is reasonable depends in turn on the extent to which state law fostered and protected the expectation at the time the expectation was formed. *Furey v. City of Sacramento*, 592 F.Supp. 463, 470 (E.D.Cal.1984), *aff'd* 780 F.2d 1448 (9th Cir.1986). That an expectation has or has not received the status of a vested right is a significant indicator of the degree to which state law fostered and protected it. Consequently, the state law of vesting significantly affects the determination of whether or not there has been a due process violation, taking or inverse condemnation.

### 2. Contract Clause

■ When a violation of the contract clause has been alleged, the existence of the contract and the nature and extent of its obligation are issues of federal, not state, law. *See Irving Trust Co. v. Day*, 314 U.S. 556, 561, 62 S.Ct. 398, 401, 86 L.Ed. 452 (1942). Nevertheless, state law is significant in resolving a contract clause claim because "[t]he obligations of a contract have long been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 20 n. 17, 97 S.Ct. 1505, 1516 n. 17, 52 L.Ed.2d 92 (1977) (citing *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 429–30, 54 S.Ct. 231, 236–37, 78 L.Ed. 413 (1934)). Thus, state law limits on the power to contract are germane to the threshold inquiry of whether there has been a substantial impairment of the contractual relationship because a subsequent law could not substantially impair an obligation that was void or substantially limited by law existing at the time the contract was entered. *See Georgia Railway Co. v. Decatur*, 262 U.S. 432, 438, 43 S.Ct. 613, 615, 67 L.Ed. 1065 (1923) (In contract clause case, state court determination of whether municipality had power to contract binds federal court); *see also Exxon Corp. v. Eagerton*, 462 U.S. 176, 195 n. 14, 103 S.Ct. 2296, 2307 n. 14, 76 L.Ed.2d 497 (1983) (that industry was heavily regulated supported conclusion that obligation not impaired); *Energy Reserves Group, Inc. v. Kansas*

---

**9.** The Court recognizes that a federal entitlement can be the source of a protectable property interest and would, therefore, be independent of state law. *See Moore v. Johnson*, 582 F.2d 1228, 1233 (9th Cir.1978). Although the developers have alleged that they have been given an entitlement, i.e., a protectable property interest, by the section 10(a) permit, the permit itself purports to give no rights to develop but only to "take" an endangered species under limited conditions. If the developers have an entitlement or protectable property interest at all, it is derived from assurances received from the City in the conduct that precipitated the granting of the permit. Whether or not that conduct creates a property interest is a matter of state law.

*Power & Light,* 459 U.S. 400, 411, 413–16, 103 S.Ct. 697, 704, 705–07, 74 L.Ed.2d 569 (1983) (no impairment of contract where existence of substantial regulation of the industry at time of contracting indicated that party's reasonable expectation could not have been impaired by the subsequent legislation); *accord* Note, *Rediscovering the Contract Clause,* 97 Harv.L.Rev. 1414, 1418, 1428 (1984) (no impairment where legislation does not frustrate settled expectations).

California vesting law affects the expectations the parties could have had at the time of the alleged contracting. For example, if the California law were such that the only way the developers could be assured of the right to proceed unimpeded by subsequent modifications in the land use laws affecting the development would be to obtain a building permit, then Brisbane's ordinances affecting the proposed development could not be said to have frustrated settled expectations. Because the nature of the parties' expectations is important in determining whether a contract obligation has been impaired, *id.* at 1428, an interpretation of California vesting law will seriously alter the nature of the contract clause claim.

### 3. Procedural Due Process

California vesting law determines the existence of the underlying substantive interest to which the developers claim a right. Whether or not that substantive interest existed will at least affect the measure of damages for being deprived of the procedural due process safeguarding the underlying interest. Thus, the measure of damages could vary depending on whether or not the developers were entitled to that for which they were allegedly prevented from applying. *See Carey v. Piphus,* 435 U.S. 247, 260, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978).

### 4. Equal Protection

An equal protection claim "presupposes a selective violation of rights bestowed by state law." *Rancho Palos Verdes Corp. v.*

*City of Laguna Beach,* 547 F.2d 1092, 1095 (9th Cir.1976). This Court must decide that the developers had the state law rights asserted before it can determine that there has been an equal protection violation. *Id.* Consequently, resolution of the state law vesting question can eliminate or materially alter the equal protection claim.

### C. Vesting Law is Uncertain

 This Court cannot predict whether or not the California Supreme Court would determine that the developers had acquired vested rights in this case. The precedents are in conflict, and there is sufficient novelty to the facts and law of this case that it is a matter better left to California courts.

The California Supreme Court adheres to the "building permit rule" for vesting by estoppel:

> An equitable estoppel requiring the government to exempt a land use from a subsequently imposed regulation must include (1) a promise such as that implied by a building permit that the proposed use will not be prohibited by a class of restriction that includes the regulation in question and (2) reasonable reliance on the promise by the promisee to the promisee's detriment.

*Santa Monica Pines, Ltd. v. Rent Control Board,* 35 Cal.3d 858, 867, 201 Cal.Rptr. 593, 679 P.2d 27 (1984) (citing *Avco,* 17 Cal.3d at 793, 132 Cal.Rptr. 386, 553 P.2d 546). However, the standard is flexible to the extent that the government promise need only be "such as that implied by a building permit...." *Id.* This Court cannot say whether or not the California court would find the complex HCP Agreement sufficiently like a building permit to warrant the estoppel needed for vested rights. *See, e.g., id.* at 35 Cal.3d at 870, 201 Cal. Rptr. 593, 679 P.2d 27 (In dissent, Justice Mosk said a tentative map was crucial and rights vested when the map was issued).

Commentators have asserted that such agreements create vested rights, *see* Marsh & Hori, *Multi-Agency Interest Agreements: Bridging the Chasm,* 3 Calif.Real Prop.J. 25, 31 (1985) (arguing that multi-

agency agreements, as used for San Bruno Mountain, confer vested rights); Sigg, *supra*, at 726 (development agreement, if held unenforceable, would confer vested rights via estoppel), and California precedent clearly admits of that possibility. *See Furey v. City of Sacramento*, 24 Cal.3d 862, 865–66, 157 Cal.Rptr. 684, 598 P.2d 844, *cert. denied*, 444 U.S. 976, 100 S.Ct. 476, 62 L.Ed.2d 403 (1979) (Without discussing vested rights, the court held that a city was estopped from amending its general plan where it had participated with other public entities to create an assessment district, annexed the land affected by the district, and then attempted to amend the general plan so as to deprive an assessed taxpayer of the benefit the assessment had purchased); *Billings v. California Coastal Commission*, 103 Cal.App.3d 729, 735, 163 Cal.Rptr. 288 (1980) ("It may be true that ... a building permit may no longer be a *sine qua non* of a vested right.... [A] vested right might arise before the issuance of a building permit if the preliminary permits approve a specific project and contain all final discretionary approvals....") (quoting *Patterson v. Central Coast Regional Commission*, 58 Cal. App.3d 833, 844, 130 Cal.Rptr. 169 (1976)). Consequently, application of the "building permit rule" to the multi-agency agreement at issue here could result in the conclusion that vested rights were obtained under California law.

Uncertainty as to the effect of the HCP Agreement is heightened by its similarity to an agreement entered under California's Development Agreement Statute. Cal. Gov't Code sections 65864–65869.5 (West 1983 & Supp.1986). A Development Agreement has the effect of giving a developer a vested right based not on estoppel, but on contract and statutory authority. Cal. Gov't Code section 65865.4 (development agreement may be enforced notwithstand-

ing changes in land-use laws). The similarity of a statutory Development Agreement to the HCP Agreement suggests that the City may be precluded from modifying its land use laws based on a contract, as opposed to an estoppel, theory.[10] Because the Development Agreement Statute is, as yet, judicially untested, the extent to which vested rights may be obtained by contract in California is uncertain.

In sum, at the core of this case is the question of whether or not the developers did, or even could have, obtained a vested right to develop San Bruno Mountain. The resolution of the vesting question will significantly affect each of the constitutional issues in this case. Because the vesting question requires exploring and enunciating in an uncertain area of state law, this Court will delay the exercise of its jurisdiction so that a California court can resolve the doubtful California law question of whether or not the developers obtained vested rights under the facts of this case.

### III. Other Unsettled State Law Questions Could Narrow or Eliminate Resolution of Constitutional Issues

■ Plaintiffs' constitutional claims challenge the constitutionality of the Housing Element adopted by Brisbane in May of 1985. Were the Housing Element given a limited reading or found to be defective under state law, its constitutionality would not have to be reached, or the character of the constitutional claims would be altered.

The developers contend that the Housing Element limits the phasing or build-out of the development to an unprofitable rate. However, defendants contend, and the terms of the Housing Element suggest, that any growth limit is flexible and waivable. *See* Housing Element, Exh. G to Defendant's First Motion to Dismiss, 82–83. A definitive interpretation of the law to the effect that it does not prevent the develop-

---

**10.** The Court acknowledges the "inalienability doctrine" that prevents a municipality from contracting away its police power. However, the agreement can be described as the present exercise of police power rather than the contracting away of that power. *See* Sigg, *supra*, at 722. Whether or not the City had the power to con-

tract as it did is an issue that should be answered by California courts (see discussion, *supra*, at 796–797) and which will be more fully explored when the Court considers the merits of the contract clause claim. *See generally* Note, *A Process-Oriented Approach to the Contract Clause,* 89 Yale L.J. 1623, 1626 (1980).

ers from building, at a rate that is profitable, the development to which they claim a vested right would significantly alter the nature of the constitutional claims. Consequently, abstention is warranted to allow the state courts to interpret the as-yet uninterpreted Housing Element of Brisbane. *See Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) (abstention appropriate where statute challenged is susceptible of a limiting construction).

Similarly, the developers have challenged the constitutionality of Ordinances 307 and 308, Brisbane Municipal Code sections 17.-02.080, 17.02.090, by contending that they allow consideration of an application for a development permit to be infinitely delayed. Defendants deny that the ordinances are subject to such an interpretation and note that they were passed in order to comply with the 1984 amendment to section 65943 of the California Government Code. An authoritative interpretation of the ordinances could narrow the adjudication of the constitutional claims that are premised on the argument that the developers are being deprived of their property because they are not able to obtain the approvals needed to utilize it. As the ordinances are susceptible to a limiting interpretation, abstention pending some author-

itative interpretation is appropriate. *See Midkiff,* 104 S.Ct. at 2327.[11]

### IV. The Posture of This Case

 The uncertain state issues identified above permeate this case; consequently, abstention as to the entire case is required.[12] The case is stayed pending resolution of the state law issues by a California Court. No discovery is to proceed, and the Clerk is hereby ordered to remove from the calendar argument on any motion previously calendared. The Court will retain jurisdiction to hear all federal issues in this case after the resolution of the state law issues.[13] *See England v. Louisiana School Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

### CONCLUSION

The developers' complaint is little different from that of the many property owners and developers who have run against California's rigorous land-use laws. The presence of an endangered species on the property to be developed has etched a federal filigree on the case, but the dispute remains primarily a conflict between a developer and a local government over the application of California land use law. As the discussion indicates, federal courts should

---

**11.** The same analysis would warrant abstention for an interpretation of the Reimbursement Resolution and proposed agreement. However, the Reimbursement Resolution issue has been rendered moot by the parties' stipulation that the developer will be billed for expenses as they are incurred, and will not be required to make any advance deposit. *See* Transcript of June 13, 1986 Hearing at 2–3; Defendants' Opening Abstention Brief, June 27, 1986, at 6 n. 4.

**12.** The Court recognizes that plaintiffs have attempted to plead their first claim as a non-constitutional cause of action brought under a federal statute. Although, state issues pervade that claim, there is no authority for abstaining from non-constitutional issues simply because of the significance of state law. *See Tomiyasu v. Golden,* 358 F.2d 651, 654 (9th Cir.1966). However, to the extent the claim is not constitutional in nature, plaintiffs have no standing to bring it. Only the government may seek to enforce a section 10(a) permit. *Compare* 16 U.S.C. section 1540(e)(1) (Secretary enforces regulations or permits) *with* 16 U.S.C. section 1540(g)(2)(A)(i) (any person may sue for viola-

tion of chapter or regulation). There is no allegation of a violation of the ESA; plaintiffs have alleged only that the HCP Agreement was violated. Consequently, in order to retain jurisdiction over the claim the Court can characterize it as a contention that the allegedly vested rights obtained in the procedures required for obtaining the permit have been deprived in violation of the fourteenth amendment, and, for the reasons explained above, abstain from that claim. Alternatively, the Court could characterize the claim as one for breach of contract and stay the exercise of its discretionary pendent jurisdiction over that claim.

**13.** The court had previously postponed resolution of a motion for sanctions; it remains postponed until the facts against which it can be weighed have been determined. The Court had also received a motion regarding the legitimacy of the reimbursement requirements. The Court considers that motion mooted by the stipulation described above at note 11.

**800**

not intervene in such disputes until state courts have had the opportunity to settle state law issues that could narrow the constitutional disputes.

Consequently, the Court is abstaining pending resolution of the following uncertain state law issues:

1. Have the developers acquired the vested rights they assert (i.e. to proceed with a 1,250–unit condominium development on the Northeast Ridge of San Bruno Mountain to be built in 5 to 8 years)?

2. Closely related to the above, does the City of Brisbane have the power to contract so as to give the developers the vested rights described above?

3. Does the Housing Element of Brisbane prevent the development to which the developers assert a vested right?

4. Do Ordinances 307 and 308 allow for an indefinite delay of the consideration of land-use permit applications submitted to the City?

Upon proper motion subsequent to the resolution of those uncertain state law issues, the Court will lift the stay and proceed to resolve the federal issues remaining in this case.

IT IS SO ORDERED.