[No. A049364. First Dist., Div. One. May 9, 1991.]

SOUTHWEST DIVERSIFIED, INC., et al., Plaintiffs and Respondents, v.
CITY OF BRISBANE et al., Defendants and Respondents;
LUMAN C. DRAKE et al., Real Parties in Interest and Appellants.

## COUNSEL

Charles R. Garry, John Christopher Burr and Sharon E. Duggan for Real Parties in Interest and Appellants.

Hamilton & Samuels, Paul R. Hamilton, Karen J. Lee, Deborah M. Rosenthal, Ellman, Burke, Hoffman & Johnson, Howard N. Ellman and John D. Hoffman for Plaintiffs and Respondents.

Thomas F. Casey III, County Counsel (San Mateo) and Michael P. Murphy, Deputy County Counsel, as Amici Curiae on behalf of Plaintiffs and Respondents.

Cecilia M. Quick, Assistant City Attorney, and Robert J. Logan for Defendants and Respondents.

## Opinion

**NEWSOM, Acting P. J.**—This is an appeal from a peremptory writ of mandate ordering the City of Brisbane to desist from conducting an election on a referendum challenging the rezoning of a portion of San Bruno Mountain. The petition was filed on December 29, 1989, by Southwest Diversified, Inc., and was later amended to add Visitacion Associates as plaintiff (the two plaintiffs are hereafter identified as Developers); it was opposed by five citizens of Brisbane and a nonprofit organization, Bay Area Mountain Watch (hereafter appellants), who represent the real parties in interest. The nominal defendants—the City of Brisbane, the Brisbane City Clerk, and Brisbane City Council—have taken a neutral position. San Mateo County has filed amicus curiae briefs both in the trial court and in this appeal on behalf of Developers.

The land in question, San Bruno Mountain, is an area of exceptional biological interest. Now surrounded by urbanization, the mountain represents the last remnant of what was once a relatively isolated and unique ecosystem on the tip of the San Francisco Peninsula. A biological census completed in 1982 found no fewer than seven animal species and twenty-seven plant species that were rare, endemic to the mountain itself, or found in a limited number of other habitats.

In the early 1970's, Visitacion Associates, a joint venture, and a related company, the Crocker Land Company, secured ownership of virtually all of the mountain and announced plans to develop large areas. Under pressure from environmentalists, San Mateo County passed a general plan amendment limiting development which led to several years of litigation between the county and Visitacion Associates. In 1980, the parties reached a settlement whereby Visitacion Associates and Crocker Land Company sold or donated about 2,000 acres on the mountain to the county and state and the remaining land was reserved for development.

The development on the mountain soon encountered another obstacle. The United States Fish and Wildlife Service had proposed in 1978 to list the Callippe Silverspot butterfly (Speyeria callippe callippe) as an endangered species. In March 1980, the agency issued a new proposal designating nearly all the area reserved for development on the mountain under the county's general plan as a "critical habitat" of the species under section 4 of the Endangered Species Act (16 U.S.C. § 1533). About the same time, significant numbers of a species already listed as endangered, the Mission Blue butterfly (Plebejus icarioides missionensis) were also found in some of the areas to be developed. Under the Endangered Species Act, the habitat of an endangered species may not be developed without a permit allowing a "taking," i.e., the destruction of part of the habitat. A prerequisite for issuing such a permit was the creation of a habitat conservation plan protecting the undisturbed habitat of the species in the locality. (16 U.S.C. § 1539(a)(2)(A).)

In May 1980, all interested parties, including Visitacion Associates, a citizens' group, San Mateo County, three adjoining cities, the California Department of Fish and Game, and the United States Fish and Wildlife Service, formed a San Bruno Mountain Steering Committee to prepare a habitat conservation plan to protect endangered species and allow limited development. San Mateo County retained an environmental consulting firm, Thomas Reid Associates, to conduct a two-year biological study of the Callippe Silverspot and Mission Blue butterflies.

While the biological study was in progress, the Fish and Wildlife Service allowed the proposal to list the Callippe Silverspot to lapse, although expressly leaving open the possibility of reconsideration. The agency indicated that, since the species inhabited essentially the same areas as the Mission Blue butterfly, it was effectively protected by the listing of that species as endangered. The biological study in fact showed that the preservation of the Callippe Silverspot presented distinct problems as it depends on a different host plant and uses a distinct habitat for mating. The steering committee continued to give equal attention to the two species. Other endangered species were not found in sufficient numbers within the area reserved for development to become a focus of study.

The final plan was implemented when all parties executed an agreement called, logically enough, agreement with respect to the San Bruno Mountain area habitat conservation plan (hereafter HCP Agreement). The HCP Agreement preserved 81 percent of the open space on the mountain as undisturbed habitat. Another 3 percent would be subject to disturbance in construction and later restored. Though expanding the protection of open space, the plan still designated for development substantial portions of the

prime habitats of the butterflies. According to the habitat conservation plan, the proposed development would destroy 14 percent of the present habitat of the Mission Blue and 8 percent of the habitat of the Callippe Silverspot.

Within the developed areas, the HCP Agreement called for a variety of measures to mitigate the impact of development, such as erosion and drainage control, revegetation with native species, strict restriction of construction activities to the construction site, establishment of buffer zones, and the phasing of construction over a period of years to minimize the impact on adjoining areas in any one season. The HCP Agreement further provided for a program of habitat management within the conserved areas, funded by local governments, Developers, and annual homeowner assessments in the new development. The program would focus primarily on preservation of the habitat by regulating uses and monitoring species populations, but it also offered the hope of actual habitat enhancement within the conserved areas. Acknowledging that the techniques were still largely untested, the habitat conservation plan called for experimental programs in eradicating exotic brush, thinning eucalyptus, seeding native grasses, and propagation of other plant species.

The case at bar concerns a low-lying extension of San Bruno Mountain, known as the Northeast Ridge, occupying about 237 acres not far from the Cow Palace in San Francisco. Approximately 90 percent of the ridge is covered by grassland. Although it contains no rare plants, it is an important habitat for the two species of butterflies that figured in the Endangered Species Act proceedings. According to a study commissioned by the Developers, it is estimated to contain 22 to 38 percent of the population of Mission Blue butterflies on the mountain and 12 to 50 percent of the Callippe Silverspot population.

At the time the conservation plan was prepared, the Northeast Ridge lay just outside the municipal boundaries of the City of Brisbane. As a party to the HCP Agreement, the City of Brisbane undertook to annex the ridge and implement the habitat conservation plan for the area. In February 1983, it adopted a Northeast Ridge specific plan, approved the Developers' tentative subdivision map, and enacted Ordinance No. 289 establishing a "Planned Development" district for the areas to be developed and an "Open Space" district for the conserved areas.

Despite its unique ecological value, the habitat conservation plan contemplated relatively extensive residential development of the Northeast Ridge, allowing the construction of 1,250 condominium units on 92 of the 237 acres. An additional 35 acres could be disturbed during construction on

condition that they would be later restored to grassland. Visitacion Associates gave an option to Cadillac-Fairview Homes West, the predecessor in interest of Southwest Diversified, Inc., to build the development. The new condominium complex was expected to increase the population of the city by one-half, change its visual character, and bring added traffic congestion.

As the project threatened to change dramatically the small town character of the community, it stimulated opposition that had only marginal relevance to the ecological concerns that had earlier limited development. In May 1985, the City of Brisbane adopted a new "Housing Element" of its general plan that would limit the number of residential units. The Developers challenged the action in federal court, claiming that the "Housing Element" unconstitutionally interfered with their vested right to proceed with the development. The federal district court, however, abstained from assuming jurisdiction over the case. In a decision rendered in August 1986, Judge Lynch ruled that the federal court would postpone the exercise of its jurisdiction until the parties had obtained a state court resolution of unsettled issues of California law relating to the Developers' alleged vested rights. (*Southwest Diversified, Inc.* v. *City of Brisbane* (N.D.Cal. 1986) 652 F.Supp. 788.)

Although the Developers initially responded to the district court decision by filing a notice of appeal and a separate action in state court, they soon entered into a "standstill" agreement with the other parties to stay the litigation pending negotiation of a new development plan. The negotiations, assisted by a mediator, lasted almost three years but eventually resulted in a settlement based on a revised plan acceptable to the Developers, the City of Brisbane and San Mateo County.

The revised plan called for development of the same total acreage, 92 acres, but reduced residential density from 1,250 units to 579 units, provided for a mixture of condominiums and single family detached homes, and required the Developers to fund a series of municipal improvements, such as parking facilities, a storm drain, a waterline intertie, and school site improvements. The total cost of these improvements would add $18,323 to the cost of each residential unit. In one respect, the revised plan vitally affected environmental interests: it substantially changed the boundaries between the open space and planned development zoning districts by moving the area of development downslope to form a more continuous pattern near the base of the ridge and leaving a larger aggregation of open space in the upper slopes and the top of the ridge. In addition, it eliminated a road

extending over the top of the ridge that would have intersected the central area of open space and moved another road downslope.

Because it changed the area subject to development, the revised plan could be carried out only with an amendment to the permit under the Endangered Species Act. To provide support for the amendment, the Developers retained an eminent ecologist, Dr. Dennis Murphy, director of the Center for Conservation Biology at Stanford University, to conduct field studies in the spring of 1988 and 1989. Dr. Murphy affirmed the environmental value of concentrating open space in one area contiguous to other open space on the mountain. In particular, he noted the importance to the survival of the Callippe Silverspot of retaining the hilltops as open space. The male Silverspots tend to gather on hilltops, while the females are more widely distributed across the grassland habitat. To mate, the females fly upslope to the male habitat. The 1982 plan would have placed roads and condominiums on hilltop locations that are important to the reproduction of the species. Dr. Murphy concluded: "The 1989 plan is a major improvement over the 1982 plan. The value of conserved habitat on the Northeast Ridge is much greater in the new plan because it increases preserved habitat in and around key habitat areas and reduces fragmentation by roads connecting development clusters."[1]

Under the settlement with the Developers, the City of Brisbane entered into a "Stipulation and Order" committing it to a schedule in acting on the Developers' applications for approval of a "Vesting Tentative Subdivision Map" and related permits and rezoning of the Northeast Ridge to make the "Open Space" and "Planned Development" districts conform to the revised development plans. After a series of hearings, the city council conditionally approved the new subdivision map on November 6, 1989; a week later, it enacted Ordinance No. 351 adjusting the zoning boundaries in the area.

Within a month of the rezoning, the citizens' group gathered the requisite number of signatures for a referendum petition putting Ordinance No. 351 to a vote. The city clerk subsequently verified the petition, and the city council set an election for April 17, 1990. The Developers responded by filing in the Superior Court of San Mateo County the petition for writ of mandate at issue here. Ruling for the Developers, the court issued an order and judgment granting a peremptory writ of mandate commanding the City of Brisbane "to vacate and set aside their actions to call a referendum

---

[1] Dr. Murphy's conclusion takes into account other environmentally adverse aspects of the revised plan—the area of temporary disturbance was increased from 35 to 44 acres, and the corridor from the northwest portion of the ridge to open space just south of the Guadalupe Canyon Parkway was further restricted.

election on Ordinance No. 351 . . . [and] to take no action to hold said referendum election."

At the outset, we note that the referendum was directed narrowly at the reconfiguration of zoning boundaries under Ordinance No. 351. It did not challenge the approval of the vesting tentative subdivision map which relocated roads[2] and required a lower density development with a mixture of condominiums and detached single family homes. We thus do not have before us the question whether the city in effect changed the permitted character of the development in a manner tantamount to a legislative action subject to referendum. (See *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 239-246 [69 Cal.Rptr. 251].) **(1a)** Instead, the issue on this appeal is the narrow one of whether the adjustment of zoning boundaries between the "Open Space" and "Planned Development" districts to mitigate the environmental impact of the development was subject to referendum.

■ The power of referendum conferred by article II, section 9, of the California Constitution applies "only to acts which are legislative in character, and not to executive or administrative acts." (*Simpson* v. *Hite* (1950) 36 Cal.2d 125, 129 [222 P.2d 225].) In distinguishing between the two, California cases have commonly cited the formulations in *McKevitt* v. *City of Sacramento* (1921) 55 Cal.App. 117, 124 [203 P. 132], and McQuillin on Municipal Corporations. (E.g., *W. W. Dean & Associates* v. *City of South San Francisco* (1987) 190 Cal.App.3d 1368, 1374 [236 Cal.Rptr. 11]; *Fishman* v. *City of Palo Alto* (1978) 86 Cal.App.3d 506, 509 [150 Cal.Rptr. 326]; *Lincoln Property Co. No. 41, Inc.* v. *Law* (1975) 45 Cal.App.3d 230, 234 [119 Cal.Rptr. 292]; *Valentine* v. *Town of Ross* (1974) 39 Cal.App.3d 954, 957-958 [114 Cal.Rptr. 678].) The *McKevitt* decision states: "Acts constituting a declaration of public purpose, and making provision for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration . . . are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, . . ." (55 Cal.App. at p. 124.) Somewhat more succinctly, McQuillin states: "The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it." (5 McQuillin on Municipal Corporations (3d ed. 1989) § 16.55, at p. 266.)

---

[2] Thus, we do not reach the question whether relocation of the roads in the revised plan constituted a legislative act under *Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448 [85 Cal.Rptr. 809, 467 P.2d 537].

The distinction between legislative and administrative action may sometimes present not only legal issues but factual issues bearing on the municipality's intent. To the extent that the judgment is based on factual determinations, we examine whether it was supported by substantial evidence. (*W. W. Dean & Associates* v. *City of South San Francisco, supra,* 190 Cal.App.3d at p. 1371.)

Ordinance No. 351 adjusts the boundaries between open space and planned development districts established in ordinance No. 289 in February 1983. Since ordinance No. 289 was one of a series of actions, including execution of the HCP Agreement, taken to implement the habitat conservation plan, the provisions of other related municipal actions are relevant to the legislative intent of the ordinance. The HCP Agreement, in particular, indicates that the boundaries of the conserved area were intended to be subject to future amendment. Article III provides: "It is recognized that the maps included within Chapter VII of the HCP indicating the boundaries of Conserved Habitat assume implementation of the HCP in light of the existing conditions and restrictions . . . , but that such maps, boundaries and conditions may be modified or revised in accordance with this Agreement." Article IX provides four procedures for amendment of "the boundary of the Conserved Habitat or Development Area." Ordinance No. 351 invoked the third of these procedures, relating to the exchange of equivalent conserved habitat, which provides in pertinent part: "Amendments . . . may be prepared for the exchange of land designated as Conserved Habitat within land designated as a Development Area within the same Administrative Parcel, . . . upon a written finding by local jurisdiction that the amendment will provide new Conserved Habitat which is essentially equivalent in biological value and acreage to the habitat which will be lost as a result of the amendment."

 Construing the original ordinance No. 289 in the context of the HCP Agreement, the trial court might reasonably find that the municipality intended the boundaries to be provisional, subject to future adjustment in accordance with the HCP Agreement. Under this interpretation, the revision of boundaries by ordinance No. 351 would fall within the accepted definition of an administrative act: it would "pursue[] a plan already adopted by the legislative body . . . ." (5 McQuillin, *supra,* § 16.55, at p. 266.)

Such an interpretation of ordinance No. 351 as an administrative act is consistent with a recent decision which involved another development on San Bruno Mountain. In *W. W. Dean & Associates* v. *City of South San Francisco, supra,* 190 Cal.App.3d 1368, the developer sought an amendment to the habitat conservation plan to mitigate a potential landslide problem.

Acting under the authority of article IX of the HCP Agreement, the City of South San Francisco approved an amendment to the habitat conservation plan calling for the grading and revegetation of 25 acres of conserved habitat and the funding of a habitat enhancement project on roughly equivalent acreage elsewhere on the mountain. The habitat conservation plan amendment was challenged by a referendum petition. Over a strong dissent by Presiding Justice White, the Court of Appeal held that the amendment was an administrative act not subject to referendum. The decision differs from the present case in certain significant respects—it sanctioned the disturbance of a substantial portion of conserved habitat and involved the amendment of the habitat conservation plan rather than a zoning ordinance—but it supports the view that the amendment of a development plan pursuant to article IX of the HCP Agreement may be regarded as merely carrying out a previously adopted legislative policy.

Appellant relies on a long and unbroken line of cases holding that the rezoning of land is a legislative act. (E.g., *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591-592 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Dwyer* v. *City Council* (1927) 200 Cal. 505 [253 P. 932]; *Landi* v. *County of Monterey* (1983) 139 Cal.App.3d 934, 937 [189 Cal.Rptr. 55]; *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 942 [162 Cal.Rptr. 210]; *Ensign Bickford Realty Corp.* v. *City Council* (1977) 68 Cal.App.3d 467, 473-474 [137 Cal.Rptr. 304]; *Hilton* v. *Board of Supervisors* (1970) 7 Cal.App.3d 708, 714 [86 Cal.Rptr. 754].) The rule was expressed in categorical terms in *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511 [169 Cal.Rptr. 904, 620 P.2d 565], which considered whether a zoning ordinance affecting a small parcel and only three landowners could properly be enacted by initiative. Noting that zoning ordinances have uniformly been regarded as legislative acts in a variety of procedural contexts, the court found "no warrant for departing from that principle" (*id.* at p. 514) and concluded: "In summary, past California land-use cases have established generic classifications, viewing zoning ordinances as legislative and other decisions, such as variances and subdivision map approvals, as adjudicative. This method of classifying land-use decisions enjoys the obvious advantage of economy; the municipality, the proponents of a proposed measure, and the opponents of the measure can readily determine if notice, hearings, and findings are required, what form of judicial review is appropriate, and whether the measure can be enacted by initiative or overturned by referendum." (*Id.* at p. 523.)

Appellant argues that we are bound by this precedent to adopt a generic analysis in distinguishing between legislative and administrative acts in the

field of land-use controls. Since the ordinance related to zoning, it must be regarded as a legislative act. We agree that such a simple generic analysis is ordinarily appropriate in this field. But the case at bar involves unique circumstances not considered in previous decisions: at the time the parcel was originally zoned, the legislative body treated the boundaries as provisional and subject to future adjustment according to prescribed standards and procedures. Moreover, the considerations that prompted the *Arnel* court to adopt a categorical rule are not present in the instant case. The court was concerned that a rule treating minor zoning actions as administrative would call for vague distinctions and deprive municipal governments of a "test which distinguishes legislative from adjudicative acts with clarity and reasonable certainty." (*Arnel Development Co.* v. *City of Costa Mesa, supra,* 28 Cal.3d at p. 523.) Here, we perceive no difficulty in confining our holding to the unique circumstances of the case. By construing the revision of a zoning boundary pursuant to a previously adopted procedure as an administrative action, we cast no doubt on the classification of zoning actions generally as legislative in nature.

The unequivocal language in the *Arnel* decision should be understood in light of the issue presented by that case. We do not believe that it compels this court to adopt a holding in conflict with the general principles distinguishing legislative and administrative actions.

Lastly, appellants argue that the trial court should have postponed consideration of the Developers' challenge to the referendum until after the election was held. California law on this point stems from a concurring opinion of Justice Mosk in *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 6 [181 Cal.Rptr. 100, 641 P.2d 200]. Justice Mosk wrote that, while courts should generally decline to hear constitutional challenges to an initiative or referendum until after the election, "this rule applies only to the contention that an initiative is unconstitutional because of its substance. If it is determined that the electorate does not have the power to adopt the proposal in the first instance or that it fails to comply with the procedures required by law to qualify for the ballot, the measure must be excluded from the ballot. [¶] Thus, for example, election officials have been ordered not to place initiative and referendum proposals on the ballot on the ground that the electorate did not have the power to enact them since they were not legislative in character (e.g., *Simpson* v. *Hite* (1950) 36 Cal.2d 125, 129-134 [222 P.2d 225]; *Fishman* v. *City of Palo Alto* (1978) 86 Cal.App.3d 506, 511-512 [150 Cal.Rptr. 326]; cf. *Farley* v. *Healey* (1967) 67 Cal.2d 325, 328-329 . . . ." The Supreme Court adopted Justice Mosk's distinction in *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658 [194 Cal.Rptr. 781, 669 P.2d 17], and quoted with approval the cited portions of his concurring opinion in *Ameri-*

*can Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 696 [206 Cal.Rptr. 89, 686 P.2d 609]. There can no longer be any doubt that the courts may remove a referendum from the ballot on the ground that it does not concern a legislative measure.

The judgment is affirmed.

Stein, J., and Dossee, J., concurred.

A petition for a rehearing was denied June 10, 1991, and the petition of real parties in interest and appellants for review by the Supreme Court was denied July 25, 1991. Mosk, J., was of the opinion that the petition should be granted.